ATLANTIC STATES LEGAL
FOUNDATION, Plaintiff,

v.

AL TECH SPECIALTY STEEL
CORPORATION, Defendant.

No. 84–CV–1040.

United States District Court,
N.D. New York.

May 15, 1986.

Allen, Lippes & Shonn, Buffalo, N.Y. (Richard J. Lippes, of counsel) and Davoli, McMahon & Kublick, Syracuse, N.Y. (Jan Kublick, of counsel), for plaintiff.

Harris, Beach, Wilcox, Rubin & Levey, Rochester, N.Y. (Paul R. Braunsdorf, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

On July 30, 1984, plaintiff Atlantic States Legal Foundation filed a citizen suit against defendant Al Tech Specialty Steel Corporation alleging numerous violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (Clean Water Act), that occurred between July of 1977 and May of 1983. Currently pending before the court are cross-motions for summary judgment. The plaintiff is seeking judgment only as to liability and requests that, should judgment be entered in its favor, a hearing be held on appropriate relief. The court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

Defendant Al Tech operates a steel products manufacturing facility in Watervliet, New York, and at the times in question, was discharging pollutants into the Kromma Kill, a small creek that flows into the Hudson River, pursuant to a water-based permit that was issued to it by the Environmental Protection Agency. Plaintiff Atlantic States contends that the defendant was discharging pollutants into the Kromma Kill at levels in excess of that permitted by the permit under which it was operating. The defendant does not unequivocally deny this contention. As stated on Page 3 of the Defendant's Memorandum of Law in Support of its Motion for Summary Judgment:

> As with many businesses trying to use state-of-the-art equipment needed to comply with the permit requirements, Al Tech had difficulty meeting its permit standards. In the late 1970's and early 1980's, Al Tech had instances in which its level of pollutants exceeded the standards set by its permits.

Because the plaintiff became aware that the defendant was exceeding its permit limitations through reports that the defendant itself was required to submit to the E.P.A., it is difficult, if not impossible, for the defendant to challenge the plaintiff's factual contentions. The defendant does, however, raise a number of legal defenses

to the plaintiff's charges, and these will now be addressed in order.

## DISCUSSION

33 U.S.C. § 1365, the primary statute upon which this action is based, provides in relevant part:

§ 1365. *Citizen Suits*

(a) Authorization; jurisdiction

Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment of the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

(b) Notice

No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or....

The defendant initially maintains that citizen suits may only be brought to seek redress for violations that were in existence at the time the complaint was

filed, and not for violations that occurred previous to that time. The defendant relies primarily for support on the Fifth Circuit's decision in *Hamker v. Diamond Shamrock Chemical Company*, 756 F.2d 392 (5th Cir. 1985), where the court held, based on its interpretation of the statutory language, that a citizen complaint filed pursuant to the Clean Water Act must allege a violation occurring at the time the complaint is filed. The defendant relies secondarily on dicta in the case of *City of Evansville, Indiana v. Kentucky Liquid Recycling*, 604 F.2d 1008 (7th Cir.1979).

However, these decisions, and especially *Hamker*, have not been followed and have been found by several courts to defy logic and reason under the statute. *See Sierra Club v. Aluminum Company of America*, 585 F.Supp. 842 (N.D.N.Y.1984); *Connecticut Fund for the Environment v. The Job Plating Company, Inc.*, 623 F.Supp. 207 (D.Conn.1985); *Chesapeake Bay Foundation v. Gwaltney of Smithfield*, 611 F.Supp. 1542 (E.D.Va.1985). The court holds that the plaintiff does have standing to sue for past violations of the Clean Water Act. To hold otherwise would serve to emasculate the statute and place plaintiffs in a position that would render them almost powerless to bring citizen suits.

The defendant's second contention is that the plaintiff does not have standing to bring this action because none of its members have used, use, or desire to use the Kromma Kill. The defendant cites the Second Circuit's decision in *Sierra Club v. SCM Corporation*, 747 F.2d 99 (2d Cir. 1984) in support of its position. In that case, the defendant was allegedly discharging excessive pollutants into a tributary of a body of water called Wolcott Creek. In affirming the district court's dismissal of the complaint, the circuit court found that, outside of the fact that some of the members of the Sierra Club lived within a seventy-mile radius of the tributary and one lived in the Town of Wolcott, there was no showing that any club members used the tributary or would be affected by its pollution.

■ The defendant's assertion that members of the plaintiff would have had to use the Kromma Kill in order to have standing to sue is without merit. In *SCM*, the court made clear that a person who is affected by the pollution in question has standing to sue. The plaintiff has alleged that several of its members use the Hudson River near the point where the Kromma Kill flows into it, and that excessive pollution in the Kromma Kill flows directly into the Hudson. This allegation is sufficient to confer standing on the plaintiff. Clearly, its members are affected by excessive pollution in the Kromma Kill, even if they do not use that body of water itself.

■ The defendant next asserts that most of the plaintiff's claims are time-barred. The defendant contends that the federal five-year statute of limitations applicable to civil penalty actions, 28 U.S.C. § 2462, is applicable here. The plaintiff argues that there is no statute of limitations for this type of action and cites several cases from the federal court in the district of New Jersey in support of its position. The court agrees with the defendant that a five-year statute of limitations should apply in cases such as the one *sub judice* and notes that several courts have so held. *See Connecticut Fund for the Environment*, 623 F.Supp. at 211–13; *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440 (D.Md. 1985); *Friends of the Earth v. Facet Enterprises, Inc.*, 618 F.Supp. 532 (W.D.N.Y. 1984).

■ Notwithstanding the five-year statute of limitations, the plaintiff makes two points, with which the court agrees, that prevent most, if not all, of its claims from being time-barred. The plaintiff's first point is that the statute of limitations did not begin to run when the violations actually occurred, but when the reports that documented those violations were filed with the E.P.A. It would have been practically impossible for the plaintiff to have discovered the alleged violations of the defendant on its own. It is only when reports are filed with the E.P.A. that the public be-

288

comes aware that violations have occurred. To hold that the statute begins to run when violations actually occur, as opposed to when they are discovered, would impede, if not foreclose, the remedial benefits of the statute. *See generally Barrett v. United States*, 689 F.2d 324 (2d Cir.1982); *Dubose v. Kansas City Southern Railway Company*, 729 F.2d 1026 (5th Cir.1984); *Nichols v. Hughes*, 721 F.2d 657 (9th Cir.1983).

■ Pursuant to § 1365(b)(1)(A), a citizen suit cannot be commenced before sixty days after the plaintiff has given notice of the alleged violation(s) to the Administrator, the State, and the alleged violator. The plaintiff's second point is that the date the notice is given should toll the statute of limitations, since the plaintiff could not bring suit within the next sixty days due to the prohibition of the statute. It has been held that if prior resort to an administrative body is a prerequisite to judicial review, the running of the statute of limitations period should be tolled during the administrative proceeding. *Nichols*, 721 F.2d at 660. The court concludes that similar reasoning should apply under the circumstances herein.

Accordingly, the statute of limitations period did not begin to run until the defendant filed its reports setting forth the alleged violations with the E.P.A. and was tolled by the sending of the sixty-day letter. Any of the plaintiff's claims that allege violations that were set forth in reports that the defendant filed with the E.P.A. no earlier than five years before the date on which the plaintiff sent the sixty-day letter are not time-barred.

The defendant's next defense is that it is entitled to avail itself of the defense of "upset." An "upset" is defined in 40 C.F.R. § 122.41(n)(1):

(n) *Upset—(1) Definition.* "Upset" means an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by oper-

ational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

Further, as set forth in 40 C.F.R. § 122.-41(n)(2):

(2) *Effect of an upset.* An upset constitutes an affirmative defense to an action brought for noncompliance with such technology based permit effluent limitations if the requirements of paragraph (n)(3) of this section are met. No determination made during administrative review of claims that noncompliance was caused by upset, and before an action for noncompliance, is final administrative action subject to judicial review.

■ However, the defendant was not operating under a technology-based permit. It was operating under a water-based permit, and there is no authority that allows the use of the "upset" defense by parties operating under water-based permits. The federal regulations cited above refer only to technology-based permits, and the E.P.A. itself has stated that the "upset" defense is unavailable to "permittees for violations of water quality-based permit conditions." Fed.Reg. # 188, 38039 (September 26, 1984). Therefore, there is no merit to the defendant's argument regarding the use of the "upset" defense.

■ The defendant's fifth contention is that it cannot be held liable for any violations that occurred before the plaintiff organization was founded, or before the members of the organization that were allegedly harmed actually joined the organization. The defendant admits that it has found no case authority for this argument. As previously stated, the plaintiff does have standing to sue in this case. Further, even if some of the alleged violations in question did occur before the plaintiff organization was founded, it is still quite possible that the Kromma Kill was harmed to such an extent that the plaintiff's members were affected by the violations even though they occurred earlier. Certainly, some pollutants could have permanently

affected the quality of the water in the Kromma Kill. This argument by the defendant is not well taken.

The defendant further asserts that many of the violations that were reported to the E.P.A. were due to measurement errors, and that, in actuality, very few, if any, violations occurred. The plaintiff counters by arguing that the reports submitted to the E.P.A. are themselves conclusive proof that violations occurred and that inaccuracy of measurements is no defense.

The defendant has submitted the affidavit of one of its engineers, Anthony Andolina, who has stated that the defendant was using an incorrect measurement procedure for many years and it was that procedure that was responsible for so many violations being reported to the E.P.A. There is no mention of any particular violations, just a general allegation that the measurements were not valid, that it took the defendant many years to discover that it was using the incorrect procedure, and that the violations that were reported did not actually occur. The following language in the Andolina affidavit is typical of the general tone of the affidavit: "In my opinion, 'violations' of oil and grease and TSS reported by Al Tech for outfall 008 probably never actually occurred, but rather were due to measurement and calculation errors." Andolina Affidavit at ¶ 92.

In *Friends of the Earth*, 618 F.Supp. at 532, the court denied a plaintiff's motion for summary judgment where the defendant presented a "multitude of justifications" for the alleged violations along with "convincing arguments why many of the alleged violations should not actually constitute violations (e.g., typographical mistakes in the DMRs)." *Id.* at 536. However, a number of cases have held that the reports submitted to the E.P.A. can alone be used to impose liability on a defendant, and even the court in *Friends of the Earth* stated that alleged measurement errors would not be enough to overcome a plaintiff's motion for summary judgment. In referring to the cases that imposed strict liability on defendants based on the filing of the reports with the E.P.A., the court stated:

> As defendant points out, however, in those cases the defendants either offered no evidence contradicting their own DMRs or argued unconvincingly that the DMRs could not be relied upon due to inaccuracies or *measuring error*. (emphasis added)

*Id.* at 536.

In *Connecticut Fund for the Environment*, 632 F.Supp. at 207, the court was also confronted with the argument that the reports could not be used as a basis to impose strict liability. The court held just the opposite and stated that a mere conclusory allegation that the reports were not accurate is not sufficient to defeat a plaintiff's motion for summary judgment. The court stated that the record must contain significant evidence supporting the defendant's position. *Id.* at 218 n. 12.

The court concludes that measurement error is not a valid basis to defeat a plaintiff's motion for summary judgment for the simple reason that a defendant could always claim that the reports filed with the E.P.A. were inaccurate due to measurement error. Since a company monitors itself for compliance with its permit and then sends the reports to the E.P.A., it would be impossible to determine if its claims regarding measurement error are valid.

However, even if the court were to assume that measurement error were a valid defense, the vague and conclusory allegations of the defendant's engineer in this case would not allow the defendant to avail itself of the defense.

Accordingly, for the reasons adduced herein, the plaintiff's motion for summary judgment as to liability is granted, and the defendant's motion for summary judgment is denied. A hearing will be held on the issue of appropriate damages.

IT IS SO ORDERED.