PUBLIC INTEREST RESEARCH
GROUP OF NEW JERSEY, et
al., Plaintiffs,

v.

YATES INDUSTRIES, INC., Defendant.

Civ. No. 89–5371 (AET).

United States District Court,
D. New Jersey.

Feb. 13, 1991.

Edward Llyod, Environmental Law Clinic, Newark, N.J., for plaintiffs.

Giordano, Halleran, & Ciesla by Richard Friedman, Middletown, N.J., for defendant.

## OPINION

ANNE E. THOMPSON, District Judge.

This matter arises on plaintiffs' motions for partial summary judgment on the issue of liability and for injunctive relief, and on defendant's cross-motion to dismiss or for partial summary judgment. Plaintiffs filed this suit under the Federal Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251 to 1387 ("the Act"),[1] claiming that

1. All further statutory references will refer to    citations from 33 U.S.C., unless otherwise noted.

defendant committed thousands of violations of the discharge and reporting requirements in its New Jersey Pollution Discharge Elimination System/Discharge to Surface Water ("NJPDES/DSW") permit. Plaintiffs brought suit under § 1365(a)(1)(i), which provides for the filing of civil actions by citizen-plaintiffs.

This court previously considered a motion by defendant to dismiss the action or, in the alternative, to stay the proceedings pending the completion of certain administrative actions. Defendant alleged that plaintiffs lacked standing, and further argued that the suit was barred by certain provisions of the Act. The court denied the motion in an opinion dated July 6, 1990, but defendant was allowed to petition the court again after the parties had conducted discovery on the issue of standing.

Defendant Yates Industries manufactures electroplated copper circuit foil at a facility in Bordentown, New Jersey. The NJPDES permit authorizes defendant to discharge certain limited amounts of several pollutants from one discharge point, DSN 001. Discharge "parameters" have been set for, among other items, flow level, temperature, pH, total suspended solids (TSS), chromium, copper, silver, and bioassay (toxicity). Further, the permit sets parameters for a second discharge point, DSN 002, which handles surface water runoff. The parameters at DSN 002 cover fewer pollutants. Both discharge points flow into an unnamed tributary of Mile Hollow Brook. This brook empties into Crosswicks Creek, which in turn flows into the Delaware River.

The permit requires defendant to take measurements at varying time intervals for different parameters, and to determine whether the discharge points are in compliance with the statute. Defendant must submit monthly Discharge Monitoring Reports ("DMRs") summarizing these measurements. If defendant takes more measurements in a month than is required by the permit, all results must be included in the DMR. Further, defendant is required to report all instances of noncompliance to the New Jersey Department of Environmental Protection ("DEP").

Plaintiff environmental groups initiated this action on December 26, 1989, having given 60 days notice of the violations as required under § 1365(a), (b)(1). They claim to represent the interests of individual members of each organization. The DEP issued a separate Administrative Order and Notice of Civil Administrative Penalty Assessment on December 21, 1989, imposing $2,633,000.00 in civil penalties and ordering defendant to comply with the permit discharge requirements.

Plaintiffs raise several categories of alleged permit violations, and seeks summary judgment as to liability on all of the following: (1) that defendant exceeded discharge parameters on 246 occasions (pl. ex. 7); (2) that it failed to report 78 of these violations (pl. ex. 8); (3) that defendant violated various monitoring requirements on 32 occasions (pl. ex. 9); (4) that defendant did not report flow level on 40 occasions (pl. ex. 10); (5) that defendant did not report the type of sample taken on 1,135 occasions (pl. ex. 11), and did not report the frequency of sampling required on 1,118 occasions (pl. ex. 12); and (6) that defendant improperly stated average measurement values as maximum values 122 times (pl. ex. 13), and gave maximum values as average values 532 times (pl. ex. 14).

In addition to challenging plaintiffs' standing to bring this suit, defendant has filed a cross-motion for summary judgment on various allegations. After reexamining the standing issue, this court will consider each of these matters in turn. Finally, the court will consider plaintiffs' request for injunctive relief.

## I. STANDING

Plaintiffs may obtain standing by representing members who have standing to sue. *PIRG v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 70 (3d Cir.1990). An individual has standing if he can " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' . . . and that the injury 'fairly can be traced

to the challenged action' and 'is likely to be redressed by a favorable decision....'" *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Defendant's challenge to plaintiffs' standing centers around what it considers to be the tenuous links between defendant's alleged acts and the purported injuries. As discussed below, however, plaintiffs have presented a strong enough nexus to establish standing.

Defendant claims that members were improperly involved in this suit only after defendant raised the standing defense. However, since the members are not parties to the suit, there is no reason to involve them from the beginning. When plaintiffs' standing was challenged, plaintiffs simply had to establish that they represented the interests of members who had standing. *Sierra Club v. Aluminum Co. of America*, 585 F.Supp. 842, 852 (N.D.N.Y.1984). Similarly, since the members are nonparties, they need not be familiar with the specific facts of the case.

■ Defendant argues that these members "assert no legally cognizable interest in the unnamed tributary of the Mile Hollow Brook." However, it is enough to show that plaintiffs' members have suffered injuries through waters directly affected by any illegal discharges. *See Atlantic States Legal Found. v. Al Tech Specialty Steel Corp.*, 635 F.Supp. 284 (N.D.N.Y.1986) (standing where flow of excessive discharge from one body of water, not used by plaintiffs' members, into a second body of water). If this court adopted defendant's position, a polluter would be able to avoid suit by controlling all access to some discrete body of water which flows into another waterway, ensuring that no potential plaintiff gained access to the actual discharge point, thus giving the polluter free reign to damage downstream points.

■ Defendant claims that the particular members have not suffered an injury. The members all live downstream from the discharge point. They assert that they would use waterways downstream from the "un-named tributary" more often and eat fish from the Delaware were it not for pollution. These types of injuries have been found sufficient in other cases. *See, e.g., Powell Duffryn*, 913 F.2d at 71.

Defendant further argues that plaintiffs have failed to show any nexus between the alleged illegal discharges and the purported injuries. Plaintiffs must do more than merely allege violations of defendant's permit. However, "[a] plaintiff need not prove causation with absolute scientific rigor...." *Id.* at 72. Plaintiffs need only show

"that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." *Id.*

The court has already discussed plaintiffs' satisfaction of the first two elements. Plaintiffs have also satisfied the third element. Thus, for example, excess pH can lead to increased alkalinity, causing eye irritation for swimmers. Excess copper, lead, cadmium and zinc can harm aquatic life. Since these and other effects touch on the injuries asserted by plaintiffs' members, plaintiffs have satisfied the causation test set by the Third Circuit in *Powell Duffryn*.

Next, defendant asserts that the alleged wrongdoings are too insignificant to support a finding of standing. As this district noted in *SPIRG v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1397 (D.N.J.1985),

"the pollution of a portion of a major, interstate waterway such as the Delaware River, is caused by the combination of discharges from many different sources. The effect of the defendant's argument would be to prohibit any citizens' suits against violators of the FWPCA unless the violation was so great or the waterway so small that the direct impact of the discharges could be pinpointed. This interpretation of the FWPCA would be directly contrary to its intent."

Yates claims that any pollution comes from other sources. However, "[t]he requirement that plaintiffs' injuries be 'fairly traceable' to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs" in order to establish standing. *Powell Duffryn* at 72.

Finally, defendant asserts that plaintiffs have not shown that their injuries would be redressed by a favorable decision. Just as pollution in a major waterway is caused by the combined effects of many individual polluters, *Tenneco Polymers* at 1397, so too the problem must be redressed one illegal discharger at a time, even though the impact of a favorable decision may not by itself be readily noticeable. Accordingly, defendant's cross-motion for dismissal based on lack of standing must be denied.

## II. THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT

A court may enter summary judgment under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates (1) that there is no genuine issue of material fact, and (2) that the evidence establishes moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-moving party has the burden to establish that a genuine issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The court must draw all reasonable inferences in the non-moving party's favor, and must accept that party's evidence when considering the merits of the summary judgment motion. *See Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

Plaintiffs' allegations are based on evidence gleaned from documents prepared by defendant for its DMRs, and on comparison of this material to defendant's permit. The evidence presented by plaintiffs will entitle them to summary judgment, unless defen-

dant can raise an issue of material fact defeating the motion.

Defendant does not respond to some of plaintiffs' individual allegations. Instead, defendant presents a number of defenses addressing different groups of plaintiffs' claims. Any allegation which is not covered by one of these defenses will be the subject of summary judgment for plaintiffs based on the evidence presented. Further, plaintiffs will be entitled to summary judgment wherever defendant's arguments fail to raise an issue of material fact. Thus, the court will first assess defendant's various defenses to determine whether it is entitled to summary judgment for the allegations covered, or whether defendant has raised an issue of material fact concerning these allegations. The court will then determine what allegations, if any, are left such that plaintiffs are entitled to summary judgment.

### A. Duplication of Allegations

■ Defendant argues that 177 allegations (def. ex. HH) should be dismissed because they duplicate violations raised in an administrative action initiated by the DEP. Preemption of citizen suits under the Act by administrative actions is covered by § 1319(g)(6). *PIRG v. Witco Chem. Corp.*, 31 E.R.C. 1571, 1576, 1990 WL 66178 (D.N.J.1990). As this court stated in its opinion of July 6, 1990, § 1319(g)(6) does not bar the current suit. *PIRG v. Yates*, Civ. no. 89–5371, transcript at 11–13 (D.N.J. July 6, 1990). Under § 1319(g)(6)(B)(ii), administrative actions do not preempt citizen suits where the notice required under § 1365(b)(1)(A) has been given prior to the action and the citizen-plaintiffs file their suit within 120 days of notice, as was the case here.

Defendant notes that this court has not stated whether individual duplicative allegations should be dismissed as a matter of equity. However, § 1319(g)(6) explicitly allows certain parallel proceedings, which will inevitably involve some identical allegations. Congress was presumably aware of the risks and inefficiencies of parallel actions when it drafted § 1319(g)(6)(B) and

determined that some duplication is acceptable. This court cannot circumvent the legislative plan by dismissing individual allegations. As this court stated in its earlier opinion, "[defendant's equity arguments] are not useful, insofar as section 1319(g)(6)(B) is rather clear on its fac[e] as to when and how it applies." *Yates*, transcript at 13.

Defendant cites to this court's statement that "Defendant's concern with duplicative expenditures and judicial efficiency are genuine." *Id.* at 15–16. However, this language was made in the context of the court's refusal to apply those very concerns. *See id.* Holding that this action should not be stayed pending the outcome of the administrative action, the court noted that a federal court has a heavy obligation to exercise the jurisdiction granted it; that the DEP and this court will not likely impose conflicting obligations on defendant; that this court has the option of adjusting any relief which may be granted to plaintiffs to reflect DEP actions; that federal courts can grant certain forms of relief which are unavailable in administrative actions; and that plaintiffs were not a party to the DEP action. *Id.* at 15. These same considerations apply to the instant motion to dismiss the 177 duplicative allegations. Accordingly, defendant's request will not be granted.

### B. DSN 002

Defendant seeks to dismiss 1150 alleged violations at DSN 002. Def. ex. II. Defendant claims that DEP officials stated that the parameters applicable to runoff at DSN 002 were imposed only to provide data for the DEP, and that these parameters would not be enforced. Defendant asserts that the discharge at this site consists of untreated rainwater, in addition to "trace amounts of non-contact cooling water and condensation from air conditioning units." Defendant further states that the permit does not provide for treatment, and that without treatment some parameters would

likely be violated. A request by defendant for a hearing on this issue was not responded to by the DEP. Two letters requesting that the DSN 002 parameter limitations be suspended also went unanswered. Nocera affid. at ¶¶ 11–19. Defendant also notes that permit limitations for rainwater runoff are infrequent. Tyler certif. at ¶ 4.

■ However, the fact remains that defendant's NJPDES permit contains parameter restrictions for DSN 002, and that defendant has violated those parameters. Defendant is responsible for the terms of its permit, *SPIRG v. Hercules, Inc.*, 23 E.R.C. 2081, 2087, 1986 WL 6380 (D.N.J. 1986), and violations of that permit are unlawful. 33 U.S.C. § 1311(a). Unless modified, the permit as originally filed remains in effect. *See* 40 C.F.R. 122.41(f), 122.62, 122.63; N.J.A.C. § 7:14A–2.3, 2.12, 2.13. Mere verbal representations by officials that certain portions of a permit will not be enforced, without formal modification in the permit, will not excuse the holder from the terms of that permit. *See SPIRG v. Anchor Thread Co.*, 22 E.R.C. 1150, 1153 (D.N.J.1984).

■ In addition, this argument, in effect, challenges the terms of defendant's permit. Under § 1369(b)(2), challenges to permits issued under the Act "shall not be subject to judicial review in any civil or criminal proceeding for enforcement."[2] The Third Circuit recently applied this section in the analogous case of *PIRG v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 31 E.R.C. 1905 (3d Cir.1990). There, defendant PDT argued that it could not be held liable under the Act for exceeding parameters for biochemical oxygen demand and total suspended solids, since those parameters are only applicable to continuous dischargers, and PDT was only an intermittent discharger. *Id.*, 913 F.2d at 77, 31 E.R.C. at 1914. The court rejected this argument:

"Whatever the merits of PDT's argument ... the Act clearly [forbids judicial review]. Under New Jersey law, a per-

---

**2.** This section applies not only to the EPA but also to approved state programs. *See id.* § 1342(c)(2).

mittee wishing to challenge a condition of a permit must request agency review within thirty days of the receipt of the permit. N.J.Admin.Code tit. 7, § 14A–8.9....

"Because PDT never challenged the BOD and TSS limits in its permit until PIRG brought this enforcement action, it may not challenge them now. By failing to challenge a permit in an agency proceeding, PDT has lost 'forever the right to do so, even though that action might eventually result in the imposition of severe civil or criminal penalties.'" *Id.*, 913 F.2d at 77–78, 31 E.R.C. at 1915 (citations omitted.)

Here, defendant has failed to challenge the permit provisions for DSN 002 through the proper state agency procedures. Thus, defendant has lost its right to challenge these provisions, and this court may not review the permit.

Defendant submits two letters from the DEP to the New Jersey Builders Association, dated December 3, 1990 and December 6, 1990. These letters state that current DEP regulations do not require stormwater permit applications for industrial facilities which mix industrial wastewater with stormwater discharges, or where stormwater comes into contact with industrial processing activities. The letters do not extend to this court jurisdiction over the terms of defendant's permit.

■ Defendant further argues that plaintiffs should be estopped from enforcing the violations at DSN 002 because of those presentations, discussed above, which it received from DEP officials. The statements which defendant attributes to the officials would appear to be directly on point. However, the court finds as a matter of law that reliance on these statements was unreasonable. As noted by the Supreme Court, reliance on oral advice is less appropriate, particularly where the issue involves complex statutory programs. *Heckler v. Community Health Services*, 467 U.S. 51, 65, 104 S.Ct. 2218, 2226, 81 L.Ed.2d 42 (1984) (interpretation of Medicare provisions). Here, as in *Heckler*, the statutory scheme is complex, and the need

for written instructions is "manifest," particularly where the advice runs directly counter to the clear terms of the permit. Defendant's reliance on DEP's silence is similarly misplaced. Further, as the court stated in *Anchor Thread* under similar facts, "if private citizen plaintiffs were estopped from maintaining a suit because of waivers or inaction by government officials, the effectiveness of [§ 1365] would be drastically curtailed and its purposes defeated." *Anchor Thread* at 1154.

The letters from the DEP to the New Jersey Builders Association, discussed above, do not alter this court's analysis of the estoppel defense. These letters were not written until well after the alleged violations at DSN 002 occurred. They therefore could not have been relied upon by defendant at the time of the violations. Nor do they have any current value to defendant, since the letters do not state that *Yates* is not bound by the requirements of its permit which are aimed at DSN 002. Accordingly, plaintiffs are not estopped from pursuing the allegations stemming from DSN 002, and defendant's request for summary judgment is denied.

## C. Alleged Violations of Effluent Limitations

### 1. Time bar

Defendant first seeks summary judgment on 25 alleged violations (def. ex. T) which it maintains are barred by the statute of limitations. Plaintiffs admits that these allegations are time-barred. Accordingly, the court will grant summary judgment in favor of defendant on these items.

### 2. Numerical calculations

Defendant seeks summary judgment on 21 charges (def. ex. U), arguing that if these discharge rates were rounded off to the nearest significant digit, defendant would not have violated its permit. Some of defendant's measurements have been more precise than the terms of its permit, recording discharges to the nearest hundredth of a unit, for example, while the permit speaks in terms of tenths of a unit. Where the permit sets an effluent level at no more than ".2 units" (as distinct from

".20" units), defendant urges that a discharge reading of .22 units should be rounded off to .2, and a reading of .26 should be rounded off to .3. According to defendant, only the latter reading would be an improper discharge.

■ Defendant cites to no authority in support of its position. The permit does set varying levels of precision for different effluents. Regardless of how defendant attempts to couch the issue, however, a reading of .22 is greater than .2, and the permit defines outer limits, not approximate tolerances. If this court were to follow defendant's logic, a reading of .249 on a substance limited to .2 units would not violate the permit, even though the reading exceeded the limit by nearly twenty-five percent. This position is unsupportable, and defendant's motion for summary judgment as to these allegations is denied.[3]

### 3. Duplicate allegations

Defendant next seeks summary judgment on several items which are duplicates. Def. ex. V. Plaintiffs apparently do not contest this claim. The court grants summary judgment for defendant as to violations 42, 73, 80, 83, 104, 105, 152, and 243 in plaintiffs' ex. 7.

### 4. Faulty laboratory analysis

■ Defendant argues for summary judgment on 18 allegations which were based on allegedly faulty laboratory analysis, and presents cover letters to several DMRs as proof. Alternatively, defendant asserts that it has raised an issue of material fact defeating plaintiffs' motion for summary judgment. DMRs may be deemed admissions when establishing liability in summary judgment motions. *SPIRG v. Monsanto*, 600 F.Supp. 1479, 1485 (D.N.J.1985) (citing *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1982)). Under some circumstances, defendant may avoid liability at the summary judgment stage on the basis of inaccurate data in DMRs. *See, e.g., SPIRG v. AT & T Bell Laboratories*, 617 F.Supp. 1190, 1205 (D.N.J.1985). However, defendant must present direct evidence of reporting inaccuracies in order to defeat plaintiffs' motion and justify its own motion for summary judgment, and it may not rely on unsupported "speculation" of measurement error. *SPIRG v. Fritzsche, Dodge & Olcott*, 579 F.Supp. 1528, 1538 (D.N.J.1984), *aff'd* 759 F.2d 1131 (3d Cir. 1985). Defendant must prove "that there were errors in the actual tests performed which showed a permit violations." *Tenneco Polymers*, 602 F.Supp. at 1400. Thus, in light of the strong evidentiary emphasis placed on DMRs, defendant has a heavy burden to establish faulty analysis.

■ Here, defendant's "evidence" of testing error is too speculative to defeat plaintiffs' motion for summary judgment. The cover letters present nothing more than theories by defendant as to why specific discharge excedences occurred, and do not show "errors in the actual tests performed." Thus, for example, the letter dated September 23, 1986 states, "Yates Industries *feels* that [these violations] can be a bad sample ...;" a letter dated December 20, 1989 states that "[t]he values reported on the DMR are suspect because Yates *believes* that this sample was somehow mistakenly switched or cross contaminated...." Defendant's contention that cadmium readings are due to false readings is unsupported by actual evidence of test errors. Other alleged errors are similarly speculative. In light of the DMRs, defendant has failed to present an issue of material fact as to whether these 18 alleged violations were due to testing error.

### 5. Bioassay parameter

Defendant next claims that it should not be liable for three bioassay violations because the permit does not contain any

---

**3.** The court notes, without ruling, that it would be inappropriate to avoid the effect of this order by instructing its laboratory analysts to report discharge levels only to the significant digit listed in the permit. Any amount over the discharge limit is in violation of the permit, and dischargers have a responsibility to report all excess effluents. Permit holders may not purposely avoid the intent of the parameters by rounding off figures to the nearest significant digit.

bioassay limitation. Part III, page 2 of defendant's permit states that there should be no measurable toxicity under the bioassay parameter. This strongly suggests that there is a bioassay limitation. However, that entry is marked by a single asterisk denoting a footnote. It appears to refer to the text of a footnote, also marked with a single asterisk, which reads, "Monitoring only." This suggests that there is *no* actual bioassay limitation.

Plaintiffs argue that the single asterisk next to the bioassay limitation actually refers to a footnote text marked with a *double* asterisk, which reads "Less than 10% mortality [sic] including in 90% effluent." Plaintiffs' argument is bolstered by several factors: (1) There is no double asterisk on the text of page 2 of Part III; (2) there is, however, a single asterisk earlier in the text of the page, next to the entry for "Silver–Total"; (3) the silver entry reads "N/A" under the column for discharge limitations, suggesting that "monitoring only" would be an appropriate footnote; (4) a plain reading of the bioassay entry suggests that "no measurable toxicity" refers to a discharge limitation, and a notation of "monitoring only" would appear to conflict with a discharge limitation. Plaintiffs claim that "less than 10% mortality including in 90% effluent" is a phrase of art "unique to bioassay testing." However, plaintiffs do not provide any evidence to back up this assertion.

■ It is possible that Part III, page 2 of the permit contains a typographical error, and that the bioassay entry should have been marked with a double asterisk. This would certainly be a more logical explanation than that posited by defendant. However, this court does not have enough information to make a decision at the summary judgment stage. Accordingly, the court finds that while defendant is not entitled to summary judgment at this point, neither is plaintiff, since there is a material issue of fact whether the NJPDES permit is intended to include a bioassay limitation.

Thus, defendant is entitled to summary judgment for the allegations listed in defendant's exhibits T (time-barred items) and

V (duplicate allegations). Further, neither defendant nor plaintiffs are entitled to summary judgment for the violations listed in defendant's exhibit X (bioassay items). Defendant, however, has either presented no evidence or failed to raise an issue of material fact to all of plaintiffs' other allegations of discharge violations.

### D. Monitoring and Reporting Allegations

#### 1. Silver discharge

Defendant presents two arguments for the position that it is entitled to summary judgment on 22 alleged violations (def. ex. Y) for failure to monitor silver discharge: that plaintiffs are estopped from enforcing the silver monitoring requirements; and that the alleged violations are wholly past.

■ Equitable estoppel may be invoked against the government where (1) the government makes a misrepresentation (2) upon which defendant relies (3) to its detriment, where (4) the misrepresentation constitutes affirmative misconduct. *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir.1987). Plaintiffs having assumed the government's role in enforcing the NJPDES permit, they would be held to any equitable estoppel defense that could be asserted against the government. *C.f. SPIRG v. P.D. Oil & Chem.*, 627 F.Supp. 1074, 1085 (D.N.J.1986).

■ The permit requires defendant to monitor silver. Since defendant does not use silver in its raw materials, it argues that the requirement was "unusual." Defendant claims that the following oral statements by DEP officials gave the "indication" that it need not monitor silver:

(1) One Yates employee asked a DEP inspector whether silver needed to be monitored, since defendant did not use silver. The inspector replied, on the spot, that defendant did not have to monitor silver. Nocera affid. at ¶ 7 (def. ex. S).

(2) During an inspection, a DEP official was asked by a Yates employee to verify that defendant did not have to monitor silver. The official said that he would

look into the matter. He never responded, but did issue a favorable inspection report. Defendant took this to signify that it need not monitor silver. McBain affid. at ¶¶ 9–12.

(3) During a phone call with a different DEP official, a Yates employee "stated that Yates was not required to monitor or report silver." Since the official did not contradict this statement, defendant assumed that it was correct. *Id.* at ¶¶ 14–15.

Defendant argues that it reasonably relied on these statements when it decided not to monitor silver. However, only the first comment was a straightforward statement that silver need not be monitored. The other statements were ambiguous at best. It would be unreasonable to rely on silence in order to ignore the clear wording of a permit.

Under the circumstances, it was also unreasonable to rely on the first comment. As discussed above, reliance on oral assurances for interpretations related to complex statutes is generally inappropriate, especially where those statements run counter to express written provisions of a permit. *Heckler,* 467 U.S. at 65, 104 S.Ct. at 2226. In addition, the first DEP inspector's comments were made "off the cuff," rather than upon careful consideration. Accordingly, the court finds that defendant may not invoke the defense of equitable estoppel.

Defendant next argues that its silver monitoring violations are wholly past and therefore immune from a claim by plaintiff. In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the Supreme Court stated that "Section 505 [of the Clean Water Act] does not permit citizen suits for wholly past violations...." *Gwaltney* at 60–61, 108 S.Ct. at 382–83. Defendant argues that, since it began to comply with the silver monitoring requirement prior to the initiation of this suit, those violations are wholly past.

However, *Gwaltney* also held that "section 505 confers jurisdiction over citizen suits where the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation...." *Id.* at 64, 108 S.Ct. at 385. Here, plaintiffs made a good-faith claim of continuous violations. They gave the statutorily mandated 60–day notice to defendant in October 1989. Defendant first monitored silver in October 1989, and this suit was brought in December 1989. Plaintiffs need only allege in their complaint that defendant was still in violation. *Id.* Plaintiffs did not have access to the DMR for October until after this suit was filed. Given the timing of defendant's initial compliance, it is far from clear that plaintiffs' allegation of continued violations were not in good faith at the time the suit was filed.

Further, defendant must do more than prove that the violation is over; it must show that the allegations were a "sham and raised no genuine issue of fact." *Id.* at 65, 108 S.Ct. at 385. There is no evidence to support such a finding. Filing a complaint one month after defendant began to comply with the silver monitoring requirement, in light of defendant's prior record of frequent noncompliance, is not a sham. *See Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 890 F.2d 690, 698 (4th Cir.1989). Thus, defendant's motion for summary judgment must be denied. To hold otherwise would be to allow polluters to escape liability in citizen-plaintiff lawsuits under the Clean Water Act by beginning compliance only upon receiving the mandatory 60–day notice, but prior to the filing of the lawsuit.

**2. Failure to report discharge violations**

Defendant next claims that summary judgment should be granted for 44 allegations that discharge violations were not reported. Def. revised ex. BB. Defendant claims that it did report these discharges. Since plaintiffs agree that 27 of these allegations should be dropped,[4] the court will grant summary judgment to defendant for

---

**4.** Plaintiffs agree that defendants should receive summary judgment for allegations 1, 2, 13, 16, 17, 19–21, 23–25, 27, 28, 30, 33–36, 39, 43, 44, 50, 53, 56, 66, 77, and 78 of plaintiffs' exhibit 8.

these items. Plaintiffs challenge the remaining 17 violations:

■ (1) Defendant says that items 3, 4, and 6 were reported in cover letters to their respective DMRs. The letters indicate that excess copper was discharged, without stating how much was discharged. Plaintiffs argue that Part I, page 7 of the NJPDES permit mandates that the level of violation be reported. It is not clear that this portion of the permit has such a requirement, however. Indeed, ¶ 14.A, which lists the information which must be reported for any noncompliance,[5] makes no explicit reference to a requirement that the *level* of violation be reported. Instead, there is a vague requirement that "[a] description of the discharge" be provided. Pl. ex. 20, Part I, page 8, ¶ 14.A(1). While plaintiffs' interpretation is not clear, however, neither is the opposite proposition established by the permit. Accordingly, there is an issue of fact whether the permit requires the level of a violation to be reported, and summary judgment will not be granted to either party.

(2) Defendant asserts that items 5 and 7–12 were reported on the appropriate DMRs. However, defendant has not produced the actual DMRs. Instead, it has only submitted the reports prepared by a testing facility hired by defendant. Since these documents do not prove that defendant reported these violations on the appropriate DMRs, defendant has failed to present evidence which raises an issue of material fact as to these 7 allegations. Similarly, since defendant has only presented unsigned versions of the DMR for December of 1985, it has not proven that the actual DMR included the discharges covered by allegations 14 and 15. Accordingly, summary judgment on these items will be denied for defendant.

(3) Defendant states that items 40, 70–72, and 75 were reported on the appropriate DMRs. Plaintiffs argue that these DMRs are insufficient because they only

state *average* levels without listing *maximum* levels. Instead, the "maximum" column reads "N/A" in each case. This court has not been presented with sufficient information to determine whether or not the DMRs for these items sufficiently reflect excess discharge. Accordingly, summary judgment for either party would be inappropriate at this point in time.

### 3. Reporting Violations Based on Underlying Discharge Violations

■ Defendant further argues that 44 reporting allegations, listed in defendant's exhibit CC, should be dismissed because it is entitled to summary judgment on the underlying discharge violations. However, the court has determined elsewhere that defendant is not entitled to summary judgment on the underlying violations, and the court also finds that plaintiffs are entitled to summary judgment on these same underlying violations. Specifically, the court has rejected defendant's arguments regarding (1) rounding off test results (those items in ex. CC which correspond to underlying items in def. ex. U); (2) laboratory error (items corresponding to underlying items in def. ex. W); (3) allegations duplicative of those raised in the DEP administrative action; and (4) allegations relating to DSN 002.

### 4. Flow and temperature monitoring

■ Defendant claims that it cannot be held liable for failure to report flow levels (pl. ex. 10) because the DEP has no authority under the Act to require flow monitoring. Defendant's position is based on following argument:

"Since all of Yates' effluent parameters are concentration based parameters, and flow itself is not a pollutant, the monitoring and reporting of flow does not provide DEP with any relevant information and is therefore statutorily void. Since the flow measurement doesn't have any relationship to protecting the health or environment, including the requirement

---

5. ¶ 14.E states, "[T]he permittee shall report all instances of noncompliance.... The reports shall contain the information required in the written submission listed in paragraph 14.D."

¶ 14.D. in turn, states "[t]he written submission shall contain the information in A.(1) through (6) [of this paragraph]."

in Yates' permit is *ultra vires* and the parameter is unenforceable." Def. brief at 50.

However, under N.J.A.C. § 7:14A–3.13(a)(9)(i)(2), which sets the requirements for NJPDES/DSW permits, each DSW permit must include provisions for monitoring "[t]he volume of effluent discharged from each outfall." Thus, state law extends specific authority for the DEP to require flow monitoring.

Defendant also argues that these violations are wholly past, since it has been in compliance since November 1989. For the reasons already set forth, however, the court will not grant summary judgment on this basis.

Defendant asserts that temperature monitoring cannot be required because "Yates' wastewater treatment process does not affect the temperature of its discharge water [and therefore] it is not a defined pollutant." Def. brief at 50. N.J.A.C. § 7:14A–1.9 includes "thermal waste" as a "pollutant." Plaintiffs have submitted no evidence that defendant produces thermal waste, suggesting that an issue of material fact remains as to the authority for the DEP to require temperature monitoring.

However, as discussed above, challenges to permits issued under the Act shall not be subject to judicial review in any civil or criminal proceeding for enforcement. Defendant has not challenged the temperature and flow parameters through the proper state agency procedures. Thus, defendant has lost its right to challenge these parameters, and this court may not review the permit.

### 5. Frequency and types of sampling

▇▇▇ Defendant next claims that the alleged failures to give frequency of sampling (pl. ex. 12) and the alleged failures to give sampling types (pl. ex. 11) should be dismissed. It argues that this court cannot hear these claims in citizen suits under § 1365(a)(1), which limits jurisdiction to violations of "(A) an effluent standard or limi-

tation under this chapter or (B) an order issued by the Administrator with respect to such standard or limitation." § 1365(f) states that an "effluent standard or limitation" includes the conditions of an NJPDES permit, however, and therefore this court's jurisdiction is proper.

Defendant further claims that these alleged violations are wholly past, since it has been providing this information since November of 1989. For reasons already discussed, the court rejects this argument.[6]

Finally, defendant asserts that neither its permit nor applicable regulations require that these items be listed on DMRs. Pl. ex. 20, Part I, page 6. However, the permit does specify that defendant must report its monitoring results on a DEP "Monitoring Report Form" ("MRF"). *Id.* at Part I, page 6, ¶ 11(F). This form includes columns for both sample type and sample frequency. (*See* plaintiffs' ex. 5 for a sample.) Since one could reasonably assume that the DEP intended the MRF to be completely filled out, there is an issue of fact whether defendant has violated its permit by failing to specify sampling type and frequency. On the other hand, this court does not have sufficient information to determine whether these omissions constitute a violation of the permit. Accordingly, neither party is entitled to summary judgment at this time for these particular violations.

### 6. Sample preservation

Defendant contends that it has presented an issue of material fact regarding four allegations contained in plaintiffs' exhibit 9. The allegations charge that each of four samples from the November 1989 monitoring period were "improperly preserved." Defendant argues that "the criteria for holding samples is not set forth in the permit." However, proper preservation techniques are set out in 40 C.F.R. § 136.3(e), and the permit requires defendant to follow these procedures. *See* plaintiffs' ex. 20, Part I, page 6, ¶ 11(C).

---

**6.** Defendant, independent of its "wholly past" argument, states that "the records currently submitted to DEP provide the agency with the frequency of sampling and type of sample." Def. brief at 52. While it is not clear whether defendant is intending to raise a separate issue, the court finds that this point is nothing more than a restatement of the "wholly past" position.

Defendant asserts that there is insufficient evidence that the samples were improperly preserved. Defendant itself presents evidence, however, which is sufficient to merit summary judgment for plaintiff. In a cover letter to the DMR dated December 20, 1989, defendant stated that "the pH, hexavalent chromium, and total suspended solids were reported as improperly preserved for the grab sample." Def. ex. EE. This amounts to an admission by defendant, who is therefore not entitled to summary judgment under the facts of this case.

Defendant argues that, since these violations occurred only once, they are wholly past. However, the violations took place only one month prior to the filing of this suit. As discussed above, the allegations were thus in good faith and are not barred under *Gwaltney*.

7. Maximum and average concentrations

■ Plaintiffs have charged that defendant reported some maximum concentrations as average concentrations and *vice versa*, leaving the other column blank, or marking it "N/A." Defendant asserts that these alleged violations, listed in plaintiffs' exhibits 13 and 14, are barred as wholly past, since it has complied with the permit since November of 1989. Once again, this position is not tenable in light of the "good faith" exception under *Gwaltney*.

Defendant does not dispute that the errors occurred. It claims, however, that 579 out of the 654 allegations, listed in defendant's exhibits FF and GG, should be dismissed because samples were taken only once during the reporting period, so that average and maximum figures would be identical. This court does not find defendant's reasoning to be persuasive. The purpose of sanctions for reporting violations is to encourage accurate records so

that plaintiffs can discover violations. Where permit holders end up submitting both proper and improper entries, however, plaintiffs would have no means to distinguish between proper and improper entries. Thus, for example, plaintiffs challenge the entries in March, 1986 for total suspended solids (TSS) and for chromium. *See* plaintiffs' ex. 13. The DMR for that month marked the "average" column for TSS "N/A," and the "maximum" column for TSS "410." Pl. ex. 5, at 41. Similarly, the "average" column for chromium was marked "N/A," and the "maximum" column marked "140." *Id.* Defendant does not challenge the impropriety of the TSS entry, but it urges that the chromium entry is acceptable since only one measurement was taken. *See* def. ex. FF. Since the DMR does not indicate how many measurements were actually taken (as compared to how many are required), plaintiffs would be unable to determine that one entry was acceptable and the other was not.[7] Here, for example, plaintiffs would be unable to distinguish the challenged 579 allegations from the 75 others which defendant does not dispute. This would interfere with the ability of citizen-plaintiffs to act as watchdogs, as was intended by § 1365.[8] Since there is no issue of fact that defendant committed the violations listed in plaintiffs' exhibits 13 and 14, defendant is not entitled to summary judgment.

8. Bioassay enforcement

Finally, defendant seeks dismissal of 6 alleged bioassay violations because the DEP has already considered these very allegations and has explicitly declined to act, because 4 of the incidents were not in fact violations, and because the incidents are wholly past.[9] Plaintiffs agree that 4 of these violations should be dismissed, *see* pl. revised ex. 9, but challenges the remaining two items.

---

**7.** Indeed, plaintiffs allege that defendant has hidden at least two discharge violations by reporting "maximum" amounts while withholding violative "average amounts". *See* pl. brief at 43 n. 29; ex. 6 at 310–11 and ex. 5 at 55; ex. 6 at 331–32 and ex. 5 at 65.

**8.** This conclusion is bolstered by the fact that excess discharge during the same period for

both the "average" and "maximum" readings for a single substance leads to two separate violations, suggesting that both columns on the DMR are significant for purposes of enforcement. *PIRG v. PDT*, 913 F.2d at 78, 31 E.R.C. at 1915.

**9.** Defendant challenges allegations 1–4, 13 and 16 listed in plaintiffs' ex. 9.

Plaintiffs argue that "defendant's argument runs counter to the basic purpose of citizen suits." P. brief at 46. As noted above, estopping citizens from bringing actions because of inaction by government officials is contrary to the purposes of § 1365. *Anchor Thread* at 1154. However, defendant correctly points out that this situation does not involve official inaction. Rather, the DEP explicitly considered the allegations, and decided not to impose sanctions. "If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably." *Gwaltney*, 484 U.S. at 61, 108 S.Ct. at 383. Thus, the court will grant summary judgment for defendant on all 6 bioassay violations listed in plaintiffs' exhibit 9.

### E. Plaintiffs' Motion for Summary Judgment

As discussed above, the evidence presented by plaintiffs establishes that they are entitled to summary judgment for all allegations where defendant has not established through contrary evidence that there is an issue of material fact or that defendant is entitled to summary judgment. This court has ruled that defendant is entitled to summary judgment for the following allegations: (1) "time barred" allegations listed in defendant's exhibit T; (2) duplicate allegations listed in defendant's exhibit V; (3) allegations 1, 2, 13, 16, 17, 19–21, 23–25, 27, 28, 30, 33–36, 39, 43, 44, 50, 53, 56, 66, 77 and 78 of plaintiffs' exhibit 8; and (4) six bioassay claims, allegations 1–4, 13, and 16 listed in plaintiffs' exhibit 9. Further, the court has ruled that neither party is entitled to summary judgment at this time for the following allegations: (1) three bioassay allegations 62, 121 and 132 listed in plaintiffs' exhibit 7; (2) allegations 3, 4, 6, 40, 70–72 and 75 listed in plaintiffs' exhibit 8; and (3) allegations concerning the reporting of frequency and type of sampling, listed in plaintiffs' exhibits 11 and 12. Defendant has failed to raise an issue of material fact regarding the remainder of plaintiffs' claims. Accordingly, plaintiffs are entitled to summary judgment for all other allegations.

## III. INJUNCTIVE RELIEF

### A. The Standard

Plaintiffs ask for injunctive relief against defendant. Where the court has granted summary judgment to plaintiffs, the motion will be deemed a request for a permanent injunction; with all other allegations, the motion will be considered as a request for a preliminary injunction.

When seeking injunctive relief, plaintiffs must show a reasonable likelihood of success on the merits and irreparable harm if the relief is not granted. *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982). Injunctive relief is inappropriate where the injury to plaintiffs can be rectified through legal remedies. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544–47, 107 S.Ct. 1396, 1403–05, 94 L.Ed.2d 542 (1987); *NRDC v. Texaco Refining and Marketing, Inc.*, 906 F.2d 934, 941 (3d Cir.1990). The court should balance plaintiffs' interests with the interests of the nonmoving party and other affected persons, as well as the public interest. *Arthur Treacher's* at 1143. The standards for permanent and preliminary injunctions are the same, except that plaintiffs must show actual success instead of probable success on the merits. *Amoco*, 480 U.S. at 546 n. 12, 107 S.Ct. at 1404 n. 12.

An injunction should be tailored so that it is no broader than is necessary to provide the necessary relief. *Ameron, Inc. v. United States Army Corps of Engineers*, 787 F.2d 875, 888 (3d Cir.), *on rehearing* 809 F.2d 979 (1986), *cert. granted* 485 U.S. 958, 108 S.Ct. 1218, 99 L.Ed.2d 419, *motion denied* 488 U.S. 809, 109 S.Ct. 41, 102 L.Ed.2d 21, *cert. dismissed* 488 U.S. 918, 109 S.Ct. 297, 102 L.Ed.2d 264 (1988). This court should "order that relief it considers necessary to secure prompt compliance with the Act." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982).

■ Not all violations of the Act warrant the imposition of injunction. *Weinberger*, 456 U.S. at 311–13, 102 S.Ct. at 1802–03. An injunction may be issued under the Act only where plaintiffs have satisfied the standards for irreparable injury, and only after the court has considered the interests of the litigants and the public interest. *Texaco*, 906 F.2d at 941. However,

> "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545, 107 S.Ct. at 1404 (quoted in *Texaco* at 941).

Further, the court may grant an injunction even where plaintiffs have not established that *measurable* harm will otherwise result. *See PIRG v. Powell Duffryn Terminals Inc.*, 720 F.Supp. 1158, 1167 (D.N.J. 1989). The purpose of the Act is to reduce the total amount of effluent discharges. *PIRG v. CP Chemicals, Inc.*, 26 E.R.C. 2017, 2021 (1987). Injury occurs where discharge limits are exceeded. *Powell Duffryn*, 913 F.2d at 72, 31 E.R.C. at 1909. Thus, violation of an effluent standard under the Act presents strong evidence of irreparable harm, because permit parameters are "precisely that part of the [Act] which is foremost concerned with the 'underlying substantive policy' of the environmental law: the preservation of the environment and the protection of mankind and wildlife from harmful chemicals." *PIRG v. Top Notch Metal Finishing Co., Inc.*, 26 E.R.C. 2012, 2015, 1987 WL 44393 (D.N.J. 1987).

### B. Monitoring and reporting violations

■ Plaintiffs have not established that they will be irreparably harmed if injunctive relief is not granted at this point in time addressing defendant's monitoring and reporting violations. Plaintiffs correctly note that permit monitoring and reporting requirements are necessary to enforce the discharge parameters in each permit. However, there is no evidence of the ways in which defendant's reporting deficiencies would interfere with the ability to enforce the Yates permit. Further, reporting deficiencies do not produce the type of direct environmental impact which is the primary purposes behind the Act.

An injunction is not needed for these violations. As discussed above, this court should only impose an injunction which "it considers necessary to secure *prompt compliance* with the Act." *Weinberger*, 456 U.S. at 320, 102 S.Ct. at 1807 (emphasis added). Here, defendant is already in substantial compliance with most of the monitoring and reporting requirements that it was previously violating. This court's opinion further clarifies defendant's responsibilities under the permit. The risk of future violations causing irreparable injury thus appears to be relatively minor, and an injunction addressing the monitoring and reporting violations is not necessary at this time.

### C. DSN 002

■ Assuming *arguendo* that plaintiffs have established likelihood of success on the merits and irreparable injury, the court finds after balancing the interests of the litigants that injunctive relief is not warranted at this time for violations at DSN 002. Defendant relied in good faith, albeit mistakenly, on certain statements by DEP officials in relation to this outflow (*see supra*). While defendant is still liable for the violations, it would be inequitable to impose an injunction in light of these circumstances, without giving defendant the opportunity to come into full compliance under less stringent sanctions. Other remedies should be sufficient to bring defendant into compliance now that any ambiguities have been settled by this opinion. Defendant will, of course, be fully responsible for all effluent violations which occur at DSN 002; this should provide ample motivation for immediate compliance with the terms of its permit.

## D. DSN 001

▮ Injunctive relief is warranted for effluent violations occurring at DSN 001. Where plaintiffs have been granted summary judgment, they have shown actual success on the merits.[10] Plaintiffs have also shown a high likelihood of success for the bioassay violations, even though the court has not granted summary judgment to either side. Although it is not clear whether the parameter for bioassay was "monitoring only" or "less than 10% mortality including in 90% effluent," the latter interpretation is more likely correct (*see supra*). No other categories of effluent violations remain for DSN 001.

While this court cannot presume irreparable harm from statutory violations, there is sufficient evidence in the instant case to show irreparable injury. This action was initiated in December 1989. Since that time, defendant has exceeded discharge parameters for DSN 001 at least once, while involved in ongoing litigation and a contemporaneous administrative action by the DEP. Thus, the risk of future violations is still present in the instant action. *See Powell Duffryn*, 720 F.Supp. at 1168 (injunction granted where defendant had one violation in 11 months). In light of defendant's long history of violations prior to the filing of this action, the court "can no longer be satisfied that the defendant will comply with its permit absent the issuance of an injunction." *Id.; see also SPIRG v. Monsanto*, 29 E.R.C. 1078, 1091.

The harm to plaintiffs by any further violations would be the very type of injury which the Act was designed to protect against. *CP Chemicals*, 26 E.R.C. at 2021. Unlike the violations in *Weinberger* and *Amoco*, where injunctive relief was found to be inappropriate, here defendant has violated effluent parameters, not mere technical statutory provisions. While plaintiffs have not established that any injury would be measurable, they need not do so. *Powell Duffryn*, 720 F.Supp. at 1167; *see supra*, discussion of standing and "fair trace-

ability". As discussed above, any effluent discharge would cause an injury under the Act, *Powell Duffryn*, 913 F.2d at 72, and such injuries are "often permanent or at least of long duration, *i.e.* irreparable." *Amoco*, 480 U.S. at 545, 107 S.Ct. at 1404. Further, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages." *Id.* This is particularly true in the instant case, where several of the substances covered by defendant's permit are toxic. *See* 40 C.F.R. § 401.13 (listing toxic pollutants, which include substances on the permit; arsenic, cadmium, chromium, copper, lead, and zinc). Based on the record before it, this court finds that plaintiffs have established that they face irreparable harm if an injunction is not granted.

Injunctive relief is warranted under a balancing of competing interests. As already discussed, the potential for injury to plaintiffs is significant, and not reparable through money damages. An order enjoining defendant from further violations will directly serve the purposes of the Act and the purpose of this litigation; ensuring that improper effluent discharges are not entered into the nation's waterways. Since the risks are greater and more directly related to the purposes of the Act than with defendant's monitoring and reporting violations, it is more imperative that the court ensure "prompt compliance." Thus, the benefit of an injunction to plaintiffs is significant, and the public interest, as expressed in the Act, will be well served by this form of relief. It does not appear that there are any third parties whose interests would be directly affected by the imposition of an injunction.

The burden on defendant should be relatively light, if defendant is correct in asserting that it is capable of complying with its permit. On the other hand, the burden on plaintiffs will be great if defendant does violate its permit in the future.

"'[S]o long as [defendant] continues in full compliance with the permit, the add-

---

**10.** Where defendant has been granted summary judgment, of course, injunctive relief is not war-

ranted.

ed compulsion of an injunction will cause no harm to Monsanto. Conversely, if there are any future violations and no injunction is presently issued, before any sanction, penalty or abatement could be ordered, another EPA order enforcement action or citizen suit enforcement action would have to be instituted with its consequent expense and delay.'" *Powell Duffryn*, 720 F.Supp. at 1167 (quoting and adopting the reasoning of *Monsanto*, *supra*).

This court is not swayed by defendant's argument that it has taken costly measures to correct effluent violations, and that it has achieved dramatic improvement in water discharge quality. However commendable defendant's efforts may be, they do not alleviate its duty to satisfy the terms of the NJPDES permit. *Cf. id.* at 1168 ("lack of fault does not exempt the discharger from complying with its permit") (quoting *Monsanto*). *See also Top Notch*, 26 E.R.C. at 2016 ("if to stay in business Top Notch must expend a large sum of money to come into immediate compliance with toxic substance limitations, that is a balance Congress has struck in favor of the environment ...").

Upon application of the test for considering injunctive relief, then, the court holds that plaintiffs are entitled to an order enjoining defendant from further discharge violations at DSN 001.

## IV. CONCLUSION

For the reasons stated, plaintiffs' motion for partial summary judgment will be granted in part and denied in part, in the manner discussed above. Defendant's motion to dismiss for lack of standing will be denied, and defendant's motion for partial summary judgment will be granted in part and denied in part, as outlined above. Finally, plaintiffs' motion for injunctive relief will granted in part and denied in part, according to the provisions stated above. The court will enter an order consistent with this opinion.

## ORDER

For the reasons stated in the court's opinion of February 12, 1991,

It is therefore on this 12th day of February, 1991

ORDERED that defendant's motion to dismiss the complaint for lack of standing be and hereby is denied, and it is further

ORDERED that defendant's motion for partial summary judgment be and hereby is granted in part, and that the following allegations are hereby dismissed:

(1) those allegations listed in defendant's exhibit T;

(2) those allegations listed in defendant's exhibit V;

(3) allegations 1, 2, 13, 16, 17, 19–21, 23–25, 27, 28, 30, 33–36, 39, 43, 44, 50, 53, 56, 66, 77 and 78 listed in plaintiffs' exhibit 8; and

(4) allegations 1–4, 13, and 16 listed in plaintiffs' exhibit 9;

and that defendant's motion for partial summary judgment is hereby denied in part as to all other allegations in plaintiffs' complaint, and it is further

ORDERED that plaintiffs' motion for partial summary judgment as to liability be and hereby is denied in part as to the following allegations:

(1) all allegations for which defendant was granted summary judgment;

(2) those allegations listed in defendant's exhibit X;

(3) allegations 3, 4, 6, 40, 70–72 and 75 listed in plaintiffs' exhibit 8;

(4) those allegations listed in plaintiffs' exhibit 11; and

(5) those allegations listed in plaintiffs' exhibit 12;

and that plaintiffs' motion for partial summary judgment on the issue of liability is hereby granted in part as to all remaining allegations in plaintiffs' complaint, and it is further

ORDERED that plaintiffs' motion for injunctive relief be and hereby is granted in part, and that defendant is hereby

(1) preliminarily enjoined from violating the terms of its permit regarding the discharge of bioassay material, and

(2) permanently enjoined from violating the terms of its permit regarding the discharge of all other effluents,

and that plaintiffs' motion for injunctive relief is hereby denied in part as to all other forms of injunctive relief.