**UNITED THERMAL INDUSTRIES, INC., Plaintiff–Appellant,**

v.

**ASBESTOS TRAINING & EMPLOYMENT, INC., Defendant–Appellee.**

No. 89–3769.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 6, 1990.

Decided Dec. 18, 1990.

Rehearing Denied Jan. 30, 1991.

---

Sara L. Nierste, Michael W. Maurizio, Osman & Associates, Dongola, for plaintiff-appellant.

John L. Kelly, Jr., Vegter, Fisher, Kelly & O'Toole, Merrillville, Ind., for defendant-appellee.

Before WOOD, Jr., CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Words, we are reminded by Humpty Dumpty, mean what parties want them to mean—neither more nor less. Our task in this contract interpretation case, like that of Alice, is interpreting words without knowing with certainty what the parties meant by them.

This action is an appeal in diversity for breach of contract. The magistrate found ambiguity in the terms of a contract and looked at the negotiating history to determine what the parties meant by the terms. The plaintiff-appellant, United Thermal Industries, Inc., argues that the contract terms are unambiguous and that parol evidence should have been excluded under the "four corners" rule. Because we find that the contract terms are ambiguous, we affirm the magistrate's use of parol evidence and his interpretation of the contract's obligations.

## I.

Asbestos Training & Employment, Inc. (ATEI), a firm which provides labor for asbestos removal projects, entered into a subcontract with the general contractor, United Thermal Industries, Inc. (UTI), to provide labor for removing asbestos from a boiler assembly at Indianapolis Power and Light's (IPL's) plant in Martinsville, Indiana. During negotiation the parties agreed to a price of $17.92 per man hour. They discussed the magnitude of the job, scheduled to last from December 9, 1987, to January 30, 1988, and mentioned that thirty to forty workers would likely be required. Tr. at 401 (testimony of Louis Arona, vice president of ATEI). The parties signed the agreement, drawn by ATEI, on December 9, 1987. Provision VII, at the center of the current dispute, states:

VII. IMPLEMENTATION:

ATEI will:

(1) furnish and include to Contractor [UTI], as comprehended in the bid price, a trained labor force meeting or exceeding all threshold requirements of safety, knowledge and facility set by applicable state and federal laws, duly licensed or certified where incensure or certification are required, to perform the project described herein;

(2) retain responsibility for payment of wages to the supplied labor force....

Pleading Vol., item 5, at 2 (reproduced in Appellant's Br. at A–3).

ATEI began work on December 15, 1987. The project quickly revealed more difficult and time-consuming work than originally assumed. Both ATEI and UTI had expected the boiler to contain soft, powdery material which would be relatively easy to remove. Instead, the workers encountered:

five separate layers of material [that] covered the boiler itself. The first layer was a canvass material; inside that was a layer of insulating mud with wire reinforcement; followed by a layer of insulating block which was wired in; then another layer of insulating mud reinforced with a chicken wire-like material; and finally a layer of refractory material.

Mem. and Order at 3. Neither party anticipated finding this material, and both parties now agree that originally projected levels of manpower were inadequate. The removal work slowed considerably, the originally anticipated completion date of January 22, 1988, became unrealistic and

UTI was forced to seek additional tools and manpower to complete the more difficult work.

UTI first asked ATEI to supply the workers. By January 11, 1988, ATEI had forty-five workers on the job. According to ATEI, UTI requested that ATEI supply an additional sixty workers; UTI contends that the request was for ten to twenty more laborers. Mem. and Order at 5; Tr. at 166–67 (testimony of R. Richey, vice president, UTI). Apparently ATEI could not meet the request, and UTI contacted labor halls in Indianapolis and Charleston, Illinois, for additional workmen. UTI trained the recruits and gave them physical examinations. The wage paid the new workers was higher than the contract provided for payment to ATEI. In sum, non-ATEI workers provided 7,375.5 of the 18,-404 hours required for the project. Mem. and Order at 5–6. UTI paid $3,720 for non-ATEI physicals, $32,924.86 in late charges to IPL and $47,523.45 in labor back charges in excess of costs (the incremental cost incurred by UTI for hiring non-ATEI workers above the contract price).

UTI seeks recovery of these costs. The basis of its claim is that the contract language requiring ATEI to provide "a trained labor force ... to perform the project" obligated ATEI to supply a labor force sufficient to complete the entire project. ATEI denies that the contract should be read to impose this obligation and counterclaims for $55,206.45 for unpaid work performed.

UTI argued below that the "four corners rule" obligates the trier of fact, in the absence of ambiguity in the contract's terms, to look only within the "four corners" of the agreement for meanings of the agreement's terms. The magistrate, however, found ambiguity in the meaning of the disputed terms,[1] referred to the parties' negotiating history, concluded that ATEI met its obligation under the agreement and denied relief to UTI while grant-ing ATEI its request for compensation for services substantially completed.

On appeal, UTI claims that the magistrate erred by finding ambiguity in the contract language and by looking outside the contract's terms. ATEI argues that the contract's terms are ambiguous in defining the size of the required labor force, that the magistrate correctly considered the extrinsic evidence and that ATEI's substantial completion of its obligation under the contract entitles it to compensation for services performed.

## II.

Indiana law governs here. The forum state's choice of law rules apply. *Klaxon v. Stentor Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). And in Illinois a contract dispute obligates the courts to apply the law either of the state with the most significant relationship or of the state where performance is to occur. Both tests point toward Indiana law. Under the first, performance was at the IPL plant in Indiana. Under the second, although the parties have some connection to states other than Indiana, the balance tips toward application of Indiana law. UTI is a Kentucky corporation with its principal place of business in Marion, Illinois. ATEI is an Indiana corporation with its principal place of business in a state other than Kentucky or Illinois. IPL's plant is at Martinsville, Indiana. When there are competing relationships to different states, the place of performance can be determinative. *Feldman Assocs. v. LinGard & Assocs.*, 676 F.Supp. 877, 882 n. 3 (N.D.Ill.1988) ("When a contract is to be performed primarily in one state, and when the other 'most significant contacts' factors prove inconclusive, the law of the place of performance governs any litigation arising from the contract."). We therefore apply Indiana law.

The only legal question this case presents is whether the contract provision

---

1. UTI also argues that Magistrate Frazier did not in his analysis actually find ambiguity before considering parol evidence. Appellant's Br. at 10–12. We discuss this issue *infra* and con-clude that the magistrate made the requisite finding. We therefore review the sufficiency of his legal analysis.

concerning the labor force is ambiguous. The four corners rule on parol evidence obligates a court, as a matter of law, to examine the language of the contract and, if no ambiguity exists, to exclude other contemporaneous or prior evidence and to enforce the terms as agreed by the parties, even if this reading is counter to the intent of one or both parties. *See Franklin v. White,* 493 N.E.2d 161, 165–66 (Ind.1986) (parol evidence rule is one of substantive law and operates to exclude evidence outside of contract terms). Only finding terms so ambiguous as to make unclear the parties' obligations under the contract permits introduction of evidence of the parties' intent or other parol material. *Tucker v. Richey,* 448 N.E.2d 1206, 1209 (Ind.Ct.App. 1983) ("In the absence of ambiguity, it is not within the function of the judiciary to look outside the instrument to arrive at the parties' intent.... Indiana applies the so-called 'four corners' rule ....") (citation omitted), *vacated on other grounds,* 460 N.E.2d 964 (Ind.1984) (disagreeing with lower court's interpretation of contract terms); *accord City of Michigan City, Ind. v. Fraternal Order of Police,* 505 N.E.2d 159, 160–61 (Ind.Ct.App.1987) ("oral expressions may not be used to vary the terms of the written contract unless the contract is determined to be ambiguous or there is a showing of fraud, mistake, illegality, undue influence or duress"); *Turnpaugh v. Wolf,* 482 N.E.2d 506, 508–09 (Ind.Ct.App.1985) ("Unambiguous language is conclusive upon the parties to the contract and the courts.") (citations omitted). The test for finding ambiguous provisions is an objective one: "The standard under Indiana law for determining ambiguity is whether reasonably intelligent persons, upon reading a contract, would honestly differ as to its meaning." *Canada Dry Corp. v. Nehi Beverage Co.,* 723 F.2d 512, 519 (1983) (citations omitted); *see also Adult Group Properties, Ltd. v. Imler,* 505 N.E.2d 459, 466 (Ind.Ct.App.1987) ("if reasonable men would find the contract susceptible to more than one construction, ambiguity exists"); *R.R. Donnelley & Sons, Co. v. Henry–Williams, Inc.,* 422 N.E.2d 353, 356 n. 3 (Ind.Ct.App.1981)

(same); *Boswell v. Lyon,* 401 N.E.2d 735, 740 (Ind.Ct.App.1980) (same; collecting cases).

▮ Applying this standard, and although the issue is close, we find that Magistrate Frazier correctly found ambiguity. He held that the terms "could support a conclusion that A.T.E.I. was to provide all of the labor for the project." Mem. and Order at 8. But "[o]n the other hand, the same language could support the conclusion that A.T.E.I. was simply to provide a trained, qualified labor force to work on the project described in the agreement." *Id.* Giving the terms of the contract their common sense meaning, we think that the contract offers little to resolve the magistrate's quandary. Parsing the terms of the contract more closely illustrates our point. First, "the project" is suggestive rather than definitive with respect to the extent of work required. UTI and ATEI clearly held radically different conceptions: ATEI envisioned a "project" of limited scope, conforming roughly to the parameters in the work estimates discussed during negotiation, whereas UTI envisioned a "project" in which ATEI would insure an adequate labor force no matter how large the work demands became. Both interpretations are reasonable readings of "the project."

Second, we find ambiguity in "labor force" for largely the same reasons. ATEI interpreted the phrase to involve somewhere in the ballpark of 5,700–6,000 hours of work. UTI envisioned a project-based labor force where the work as it was completed defined the extent of ATEI's obligation. Once again, neither position is unreasonable and both are supported by the wording of the contract.

▮ Third, the rules of contract construction are unhelpful here in discerning which interpretation is the more reasonable. It is axiomatic that a contract is, in case of ambiguity, to be construed against the drafter—here, ATEI. *Bell v. Commonwealth Land Title Ins. Co.,* 494 N.E.2d 997, 1000 n. 1 (Ind.Ct.App.1986). Even so, the text lacks enough significant clues for us to hold that UTI's interpretation is more plausible than ATEI's. So

while it is a close question, we hold that extrinsic evidence of intent in forming the contract is admissible.

■ UTI makes the additional argument that Magistrate Frazier improperly admitted the extrinsic evidence without first finding the requisite ambiguity. UTI contends that the magistrate indicated that he found no ambiguity but then considered extrinsic evidence. Appellant's Br. at 10–11. We do not read the magistrate's findings this way. In fact, the transcript indicates that the magistrate thought that the terms might be so facially ambiguous as to invite the interpretive aid of outside evidence:

> Well, this provision of the contract in question is not precise. I don't think anybody would claim that it is. It depends on how you describe ambiguous I guess. It's unambiguous in certain respects, in that it does require ATEI to furnish a labor force to do the job. This as comprehended in the bid price takes in a lot. I think that reference in itself almost invites resort to matters outside the four corners of the contract. The bid price being seventeen ninety two per man hour, I'm quite certain that there was some formula or some method employed to reach this figure, and if that formula includes how many people does it take to do this job, how many trained people working regular work days does it take to do this particular job—and really that's kind of the nut of the lawsuit as to whether or not there were sufficient workers provided pursuant to the contract—and this is I think, even construing it in your client's favor, which I would do regarding ambiguous terms because it was drawn by ATEI, I still believe that this language invites resort to matters not specifically included in the contract....

Tr. at 94–95. Even though the bid price may not be the operative factor, the magistrate's reasoning is correct that the extent of ATEI's obligation is not clear. In addition, and more important than his oral comments, the magistrate's written findings

clearly indicate that he found the requisite ambiguity. Mem. and Order at 8–9.

### III.

■ The only other issue is whether the magistrate's construction of the parties' intent is correct. Although the determination whether the contract contains ambiguous language is a question of law, *Williams v. National Can Corp.*, 603 F.Supp. 1268, 1275 (N.D.Ind.1985), interpreting the evidence to implement the parties' intent is a determination of fact, *Canada Dry Corp.*, 723 F.2d at 519 ("Where ambiguity in a contract is to be resolved by such evidence as statements made in pre-contract negotiations, construction of the contract is a matter for the fact finder.") (citing *R.R. Donnelley*, 422 N.E.2d at 356). We therefore defer to the fact finder's conclusions. The magistrate determined that ATEI supplied the labor force contemplated by the parties in pre-contract negotiations, and we find this conclusion consistent with the evidence.

■ First, ATEI prepared its bid on the basis of estimates provided by UTI of the man hours required to complete the project. We recognize and acknowledge UTI's argument that these estimates in all likelihood did not affect ATEI's bid price, and testimony from ATEI confirms this. Tr. at 384–85 (testimony of George Perry, president of ATEI); Appellant's Br. at 14. But these estimates still informed ATEI about the likely demands of the job. The estimates later proved to be substantially short of the job's actual demands. Had more accurate estimates been available before signing, ATEI might have arranged for additional workers or told UTI that it could not supply the entire force. In short, to countenance UTI's understanding of the contract language would obligate ATEI to insure the project no matter how unreasonable the work demands became, an interpretation we believe the parties could not have intended at signing.

Second, we believe that the man hours actually supplied by ATEI employees were in line with the parties' intent. ATEI apparently employs about 150 employees,

thirty to forty of whom were originally scheduled for the UTI project. Additional men, explained ATEI's President, could have been available for employment but training and preparation time may, he warned, cause a delay in getting them to the site. Tr. at 340–41, 351. UTI recalls the negotiations, reported by its president, as including projections of forty to fifty men on the job, with the balance of ATEI's 150 employee work force available to be on the project on twenty-four hours notice. Tr. at 123. No matter which version is correct, the parties' expectations were established when the president of UTI, on a walk-through inspection of the boiler during negotiation, estimated that the project would require approximately 5,712 hours. Tr. at 92–93; Mem. and Order at 9. ATEI eventually supplied a total of 11,055.5 hours of work out of the project's total of 18,404. Mem. and Order at 5. By the project's end, ATEI had sent 107 individual workers to the site, with a daily average from January 12, 1988, to February 2, 1988, of thirty-six men on the job. We agree with the magistrate that UTI "got all that it bargained for." Mem. and Order at 9.

We therefore cannot find as a matter of law that ATEI's labor commitment to the project was inconsistent with a reasonable interpretation of the contract. The magistrate found it unreasonable to assume that ATEI would supply all work force demands, and we will not upset that finding now. *Adult Group Properties, Ltd.*, 505 N.E.2d at 466 ("Wherever the intent of the parties to a contract is not spelled out, and the evidence is conflicting, the issue as to their intent is a question of fact.") (citation omitted).

UTI also argues that the magistrate erred by examining the facts surrounding negotiation and that the only events relevant to interpretation of the contract are what occurred during performance. Appellant's Br. at 12–14. This argument fails for two reasons. First, our obligation is to discern the parties' intent at signing, and the negotiating history is certainly relevant to this inquiry. Second,

even if the examination were limited as UTI requests, this would not bolster UTI's claim. ATEI supplied much of the additional labor needed to complete the project. Then, when ATEI had difficulty supplying more, UTI began hiring workers from union halls. These events are consistent with the interpretation that ATEI had supplied its quota of workers and that UTI then supplemented the work force with the newly hired hands.

### IV.

The final issue on appeal is ATEI's counterclaim for $55,206.45, allegedly owed ATEI by UTI for unpaid services. UTI argues that because ATEI breached the contract, it is not obligated to pay for work after the time that UTI hired non-ATEI workers for the job.

The magistrate held that because ATEI was not in breach, UTI was liable for the work performed by ATEI. We approve this conclusion. Because ATEI substantially performed under the contract, ATEI is also entitled to compensation for the work it supplied.

The judgment of the district court is therefore AFFIRMED.