UNITED STATES of America

v.

ALUMINUM COMPANY OF AMERICA.

No. 6:92 CV 564.

United States District Court,
E.D. Texas,
Tyler Division.

June 28, 1993.

Randi Davis Russell, Asst. U.S. Atty., U.S. Attorney's Office, Tyler, TX, David Fishel, Paul J. Schaeffer, Vicki A. O–Meara, Courtney Ann Johnson, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, Robyn L. Moore, U.S. E.P.A., Asst. Regional Counsel, Region IV, Dallas, TX, for plaintiff U.S.

Herbert A. "Trey" Yarbrough, III, Conner, Gillen, Yarbrough & Anderson, Tyler, TX, Richard Oran Faulk, Akin, Gump, Strauss, Hauer & Feld, Houston, TX, Denise D. Hunkele, Aluminum Company of America, Pittsburgh, PA, Catherine J. McEnearney, Mark P. Fitzsimmons, Cheryl A. Falvey, Luis Rizo Mejia, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for defendant Aluminum Company of America.

## AMENDED MEMORANDUM OPINION

JUSTICE, District Judge.

■ Pending before the court for consideration and resolution are the government's motion for partial summary judgment on the issue of liability for civil penalties under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, *et seq.,* and the cross-motion of the defendant, the Aluminum Company of America ("ALCOA"), for partial summary judgment.[1]

## I. UNDISPUTED FACTS

In 1973, ALCOA began to construct an aluminum plant at a site which it owned in Anderson County, Texas, approximately eight miles from the City of Palestine. ALCOA began operations at the facility in June 1976. In 1986, ALCOA began to make plans to dismantle the facility. ALCOA completed the dismantling on or about August 1989.[2]

The manufacture of aluminum at the plant involved treating alumina (an anhydrous form of bauxite) with No. 6 fuel oil and reacting the "coked alumina" with chlorine gas at high temperature. In 1974, ALCOA applied for a National Pollutant Discharge Eliminations System ("NPDES") permit to discharge waste water from the plant to an unnamed ditch which led to Hurricane Creek. The United States Environmental Protection Agency ("EPA") issued NPDES permit no. TX0056341 which was effective in January 1976, to expire in January 1981, authorizing the discharge of designated pol-

---

**1.** ALCOA's cross-motion was filed almost two weeks after the deadline for motions, established in the docket control order (entered February 2, 1993), had expired. It would therefore be appropriate to refuse to consider ALCOA's motion, especially as it appears that the statute of limitations defense raised by ALCOA could have been asserted well before the expiration of the motions deadline. However, in the interests of judicial economy, the court will resolve the motion on its merits to avoid forcing the parties to go to trial on defenses which involve pure issues of law. Considering ALCOA's course of conduct through-

out the pretrial phase of this case, and the warnings issued by the court, it is found that sanctions for ALCOA's dilatory conduct are appropriate. Accordingly, sanctions in the amount of $5,000 will be assessed against ALCOA and its attorneys, each to pay half of the assessed amount.

**2.** However, for approximately three and one-half months in 1987, ALCOA used the facility for the revaporization of approximately 400,000 lbs. of aluminum chloride.

lutants to Hurricane Creek.[3]

In December 1980, ALCOA made its timely application for the renewal of its NPDES permit, which caused the 1976 permit to continue in effect until a new one could be issued. The EPA issued ALCOA a renewed NPDES permit, which became effective on September 24, 1985.[4] ALCOA's NPDES permit required ALCOA to monitor for pollutants by taking samples, having them analyzed, and reporting the results to the EPA by filing Discharge Monitoring Reports ("DMRs").[5]

Certain external outfalls covered by the NPDES permit are point sources as defined by the CWA, 33 U.S.C. § 1362(14), *i.e.,* Outfalls 002, 003, 005, and 006. Outfall 004, an internal outfall which is located within the ALCOA plant area, is also covered by the permit, which required ALCOA to begin monitoring for pollutants and meeting effluent limitations [6] for the chlorinated hydrocarbons Decachlorobiphenyl ("DCBP") and Hexachlorobenzene ("HCB") when it "restarted" the plant's 42-inch reactor.[7] Under the terms of its permit, ALCOA was required to monitor its effluent and meet limitations at Outfall 004 until "six months after close-down of the reactor unit or after 4 consecutive samples for the ... [HCB and DCBP] show less than the limits for Outfall 004 and less than the limits for Outfalls 002,

003, 005, and 006, whichever is later in time." *See* Permit TX0056341, at 8, Part I (Attachment E, Exhibit 10, government's motion for partial summary judgment).

Sometime after the 1985 permit was issued, ALCOA began using the 42-inch reactor to revaporize, or purify, aluminum chloride which had been contaminated. ALCOA did not use the reactor to develop new processes or techniques for the production of aluminum chloride. The DMRs filed by ALCOA establish that the permit conditions for Outfall 004 were met by March 11, 1988. The government has stipulated that the permit's monitoring requirements for Outfall 004 ceased on that date.

The government seeks civil penalties for 174 violations of the CWA, beginning in August 1987.[8] The number of violations was calculated by EPA employee Pamela Teel, who compared the DMRs filed by ALCOA on September 29, 1987, with the limitations set forth in the NPDES permit. *See* Declaration of Pamela J. Teel (Attachment J, government's motion for partial summary judgment). ALCOA admits that the DMRs accurately reported ALCOA's test results, but denies that the levels reported were actually in excess of the permit limitations, given the statistical confidence intervals inherent in the DMR measurements. ALCOA also asserts a statute of limitations defense, contests the

---

3. The parties have stipulated that both Hurricane Creek and the unnamed ditch are navigable waters of the United States within the meaning of the CWA.

4. Except as otherwise noted, all references in this opinion are to the 1985 permit.

5. The CWA is principally self-policed, and permittees are required to monitor their effluent discharges and file reports with the EPA. *See* 33 U.S.C. § 1318; 40 C.F.R. §§ 122.41(j) and 122.-48.

6. An "effluent limitation" is defined by section 502(11) of the CWA as "any restriction established by a State or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the oceans, including schedules of compliance." 33 U.S.C. § 1362(11).

7. HCB and DCBP are pollutants as defined in section 502(6) of the CWA, 33 U.S.C. § 1362(6),

as well as toxic pollutants as defined in section 502(13) of the CWA, 33 U.S.C. § 1362(13). The substances regulated by the permit are also referred to as "parameters."

According to EPA's environmental scientist, Pamela Teel, chlorinated hydrocarbons such as HCB and DCBP do not occur in nature, and, once released, will remain in the environment for decades. Chlorinated hydrocarbons have limited solubility in water, but they are highly soluble in fats; as a result, they can accumulate in the fatty tissues of organisms, and their concentrations in the top levels of the aquatic food chain can be thousands of times higher than in the water (a process called "biological magnification"). Many chlorinated hydrocarbons are carcinogens. *See* Attachment J, government's motion for partial summary judgment.

8. The government initially alleged that 180 violations had occurred, but has since revised its position, and omitted violations at Outfall 004 which occurred after March 11, 1988.

government's use of "daily average" violations as thirty separate violations, and claims that the terms of the permit with regard to monitoring requirements and limitations for Outfall 004 are ambiguous.[9]

## II. SUMMARY JUDGMENT STANDARD

■■ Summary judgment is proper under Fed.R.Civ.P. 56(c) when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment or partial judgment as a matter of law. To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *L & B Hosp. Ventures, Inc. v. Healthcare Int'l, Inc.,* 894 F.2d 150, 151 (5th Cir.), *cert. denied,* 498 U.S. 815, 111 S.Ct. 55, 112 L.Ed.2d 30 (1990). Once a movant for summary judgment has established that there is an absence of genuine issue of material fact, the nonmovant must establish each of the challenged essential elements of its case for which it must bear the burden of proof at trial. *Brock v. Chevron U.S.A., Inc.,* 976 F.2d 969 (5th Cir.1992). *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (if the movant establishes, *prima facie,* that there is no genuine issue as to any material fact, "the non-moving party must come forward with specific facts showing a genuine issue for trial.").

The substantive law underlying the claim at issue identifies which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. If any such facts are genuinely in dispute,

summary judgment is not appropriate. When assessing a motion for summary judgment, the court must make all factual inferences in favor of the party opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 975 (5th Cir.1991). However, the judge is not to weigh the evidence, nor engage in credibility determinations. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510-11.

The government argues that summary judgment is particularly appropriate in CWA cases because Congress has decreed that enforcement actions be kept simple and speedy, and, to effectuate this mandate, has imposed a strict liability standard on persons who violate the terms of their NPDES permits. *See Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 451-52 (D.Md.1985).

## III. DISCUSSION

### A. *Statute of Limitations*

■ The parties have stipulated that the applicable statute of limitations for an action for civil penalties under the CWA is five years from the date the claim accrues. 28 U.S.C. § 2462. The government's complaint was filed on September 22, 1992; thus, a claim which accrued prior to September 22, 1987, is barred. The government's position is that a claim accrues when the violator reports the violation to the EPA, or, in this case, September 29, 1987. ALCOA asserts that a claim accrues on the date the violation actually occurred, and that 129 violations which were reported in September but which occurred in August 1987, are barred by the statute of limitations.

Determining when a claim first accrues is a complex task. The language of a statute of limitations must be "interpreted in the light of the general purposes of the statute and its other provisions, and with due regard to those practical ends which are to be served

9. ALCOA admits the following three violations: Outfall 001—October 15, 1987 (1 excursion for total chlorine, daily minimum); Outfall 001—November 9, 1987 (1 excursion for total chlorine, daily minimum); and Outfall 002—February 6, 1990 (1 excursion for oil and grease, daily maximum). Accordingly, summary judgment for the government will be granted with regard to these three violations.

by any limitation of the time within which an action must be brought." *United States v. Core Laboratories, Inc.,* 759 F.2d 480, 481–82 (5th Cir.1985) (citing *Reading Co. v. Koons,* 271 U.S. 58, 46 S.Ct. 405, 70 L.Ed. 835 (1926)).

The United States Court of Appeals for the Fifth Circuit has not explicitly addressed the issue of whether a claim for civil penalties accrues upon the actual occurrence of the violation of a provision of an environmental statute such as the CWA, or upon the subsequent report of that violation.[10] However, several other courts have considered the purposes and legislative history of such acts, and have held that such a claim accrues when the appropriate agency receives the statutorily mandated report. *See Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64 (3rd Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Sierra Club v. Union Oil Co. of California,* 813 F.2d 1480 (9th Cir.1987), *vacated and remanded on other grounds,* 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988), *judgment reinstated and remanded,* 853 F.2d 667 (9th Cir. 1988); *United States v. Windward Properties, Inc.,* 821 F.Supp. 690 (N.D.Ga.1993); *Natural Resources Defense Counsel, Inc. v. U.S. E.P.A.,* 806 F.Supp. 1263 (E.D.Va.1992); *Atlantic States Legal Foundation v. Al Tech Speciality Steel, Corp.,* 635 F.Supp. 284 (N.D.N.Y.1986). *See also United States v. Hobbs,* 736 F.Supp. 1406, 1409–10 (E.D.Va. 1990).

■ The objective of the CWA is to protect human health, welfare, and the environment, to eliminate the discharge of all pollutants to waters of the United States, and to restore the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). The CWA is entitled to a broad construction to implement its purpose. *Shanty Town Associates Ltd. Partnership v.*

*E.P.A.,* 843 F.2d 782, 792 (4th Cir.1988); *United States v. Hamel,* 551 F.2d 107, 112 (6th Cir.1977). *See also United States v. Sellers,* 926 F.2d 410, 416 n. 2 (5th Cir.1991) (the criminal penalty provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(d)(2)(A), is entitled to liberal construction to effectuate the purposes of the Act, *i.e.,* to protect the public health).

The CWA gives the EPA the authority to issue NPDES permits which allow limited discharges of pollutants to waters of the United States. 33 U.S.C. § 1342. The permits impose requirements on the discharging entities for monitoring, sampling, analyzing, and reporting compliance or non-compliance with the permit. 40 C.F.R. § 122.41. The report, or DMR, must be signed by a designated officer and verified as true under penalties of law, which may include fines and imprisonment. 40 C.F.R. § 122.22.

In *Powell Duffryn Terminals,* the Third Circuit determined that the five year time period begins when the defendant files its DMRs, "since the responsibility for monitoring effluent rests with the defendant, 33 U.S.C. § 1318(a)(4)(A), and the public cannot reasonably be deemed to have known about any violation until the permit holder files its DMRs." 913 F.2d at 75. *See also Atlantic States Legal Foundation,* 635 F.Supp. at 287. Similarly, in a civil penalties case brought under the Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq.,* the court held that where the defendant manufacturer had a duty to report product defects to the Consumer Product Safety Commission, the statute of limitations under 28 U.S.C. § 2462 begins to run from the date the defect is reported. *United States v. Advance Mach. Co.,* 547 F.Supp. 1085 (D.Minn.1982). To hold otherwise, the court reasoned, would encourage the manufacturer to violate the reporting requirement and hide evidence of

**10.** The Fifth Circuit has held that a claim under the antiboycott provisions of the Export Administration Act accrues, for the purposes of a statute of limitations analysis under 28 U.S.C. § 2462, on the date the violation occurred. *United States v. Core Laboratories, Inc.,* 759 F.2d 480 (5th Cir.1985). The government had argued that the claim accrued on the date of the final adminis-

trative order assessing a penalty for the underlying violation. The court rejected this argument, and found that to hold otherwise would give the government the power to prolong the limitations period by drawing out the administrative process, thus forcing the defendant to remain indefinitely under the hazard of having penalties imposed. *Id.* at 483.

the product defect from the Commission until the five year limitations period had run. *Id.* at 1090. *See United States v. Windward Properties, Inc.*, 821 F.Supp. 690, 694 (N.D.Ga.1993) (to hold that the claim accrues when the violation occurs, as opposed to when the violation is discovered, "would impede, if not foreclose the remedial benefits of the [CWA].").

ALCOA argues that the point at which a claim for violations of the CWA accrues varies according to whether the claim is asserted by a citizens' group or by the government. This line of reasoning is not persuasive.

> Since plaintiffs in a citizens suit are acting as an adjunct to government enforcement actions, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49 [108 S.Ct. 376, 98 L.Ed.2d 306] (1987), citizens should be subject to the same limitations period as the government. The Act envisions a scheme whereby citizen suits supplement government efforts. Thus applying a different ... [limitations period] could frustrate this scheme by allowing citizens to bring suits where the government would be barred or vice versa.

*Powell Duffryn Terminals*, 913 F.2d at 74. *See also United States v. SCM Corp.*, 667 F.Supp. 1110, 1123 (D.Md.1987); *Hobbs,* 736 F.Supp. at 1409–10.

■ In the alternative, ALCOA alleges that the EPA had sufficient information about the permit violations prior to September 1987 to start the limitations period running. ALCOA also argues that the EPA should have known of the violations because EPA has the right to inspect permitted facilities. Essentially, ALCOA states that, if the discovery rule is to be applied in this case, it should be expanded beyond the inquiry as to when the DMRs were filed, and should encompass all evidence that indicates that the EPA knew or, through the use of reasonable diligence, should have discovered the violation. Other circuits have read 28 U.S.C.

§ 2462 as necessarily including a broad, objective discovery rule within its definition of when a claim "accrues." *See Windward Properties*, 821 F.Supp. at 694. An objective discovery rule adequately balances the interests found in CWA cases, in that it discourages the government from unreasonably delaying in bringing actions, while protecting the public from harm resulting from an inability to prosecute claims for violations that could not reasonably have been discovered. *Id.*

ALCOA points to a series of correspondence and memoranda between ALCOA and EPA Region VI, and ALCOA and EPA headquarters in Washington, D.C., dating from August 1978 through July 1987. The permit requires that violations be reported to the Director of the Water Management Division of Region VI in Dallas, Texas. *See* Permit TX0056341, at 8, Part II (Attachment E, Exhibit 10, government's motion for partial summary judgment).[11] The government claims that the correspondence failed to comply with the permit requirements, and that EPA Region VI was unaware of ALCOA's letters to Washington.

The government's position with regard to the letters sent to Washington is meritorious. Moreover, most of the correspondence cited by ALCOA as evidence that EPA Region VI had knowledge of the violations dates from 1978 to 1980. It is found, as a matter of law, that such dated documents could not possibly have put the EPA on notice of exceedances of specific pollutants at any particular outfall for the time period for which penalties are sought. The only documents cited by ALCOA which arguably could have put EPA Region VI on notice that exceedances of HCB and DCBP at Outfall 004 were occurring during the relevant time period are three letters from Oswald Wilkinson to Robert E. Layton, Jr., at EPA Region VI in June and July 1987.[12]

---

11. The original permit required ALCOA to report its monitoring results to the Regional Administrator of EPA Region VI in Dallas, Texas, and to the Executive Director of the Texas Water Quality Board in Austin, Texas. *See* Permit TX0056341, at 7, Part I (1976) (Attachment D, Exhibit 10, government's motion for partial summary judgment).

12. The government seeks penalties for violations which occurred not in June or July, however, but in August and September.

The equities of the arguments raised by ALCOA in support of its statute of limitations defense overwhelmingly favor the government. *See Badaracco v. Commissioner,* 464 U.S. 386, 391, 104 S.Ct. 756, 761, 78 L.Ed.2d 549 (1984) (statutes of limitations asserted as a defense against the government must receive a strict construction in favor of the government); *Sage v. United States,* 908 F.2d 18, 24 (5th Cir.1990) (same); *Advanced Mach. Co.,* 547 F.Supp. at 1091 (equities favor the government in an action in the public interest for civil penalties under the Consumer Product Safety Act where product manufacturer failed to show that it was prejudiced by the passage of time).

The evidence submitted by ALCOA in support of its argument that the EPA knew or should have known about the violations alleged in the government's complaint does not raise a material issue of fact with regard to this issue. The government alleges, and ALCOA does not dispute, that EPA Region VI receives approximately 14,270 DMRs each month, and has limited resources with which to perform inspections of permit holders' facilities, generally only inspecting approximately 900 facilities per year out of nearly 5,600 total active permits. Even though the EPA had the right to inspect ALCOA's Anderson County facility at any time, 33 U.S.C. § 1318, a belief that the EPA should have in fact inspected the facility, or should have tested the effluent at the relevant outfall and discovered the August 1987 violations, does not correspond with reality. Congress was fully aware of the agency's limited resources when it drafted the CWA provisions requiring the permittee to monitor and report its own effluent discharges. To allow the permittee to benefit from the EPA's failure to inspect and immediately discover violations would frustrate the purposes of the CWA. Furthermore, ALCOA does not allege that it was in any way prejudiced or that its ability to defend this suit was so seriously impaired that dismissal of the claim for the August 1987 violations is justified. Accordingly, ALCOA's motion will be denied.

**B.** *Government's Motion For Summary Judgment As To Liability*

■ Section 301 of the CWA, 33 U.S.C. § 1311, prohibits the discharge of pollutants from a point source into navigable waters of the United States except as otherwise authorized by the Act. The only means by which a point source discharger can escape the absolute prohibition of § 301 is to obtain a NPDES permit, as allowed by § 402 of the CWA, 33 U.S.C. § 1342. *See Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369 (D.C.Cir.1977). Any discharge of a pollutant without a permit is unlawful, as is any discharge of a pollutant not in compliance with the conditions or limitations of the NPDES permit. *See Carr v. Alta Verde Industries, Inc.,* 931 F.2d 1055, 1058 (5th Cir.1991).

**1. Penalties May Be Imposed For A Violation Of The Permit**

■ The government has brought this action for civil penalties under § 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), which prohibits the discharge of pollutants to navigable waters of the United States through a point source in violation of the limitations and conditions of a NPDES permit. *See Mumford Cove Ass'n, Inc. v. Town of Groton,* 640 F.Supp. 392, 394 (D.Conn. 1986). To establish a violation of the CWA, the government need only prove that ALCOA violated the terms and conditions of its NPDES permit. *Student Public Interest Research Group of New Jersey v. Yates Industries, Inc.,* 757 F.Supp. 438 (D.N.J.1991); *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158 (D.N.J.1989), *aff'd in relevant part,* 913 F.2d 64 (3rd Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). *See also Mumford Cove,* 640 F.Supp. at 395 (a defendant is strictly liable for violations of the conditions of its NPDES permit; fault, intent, and environmental harm which results from the violation are only relevant with respect to the amount of the penalty to be assessed).

ALCOA does not challenge the general principle that a violation of the NPDES permit equates to a violation of the CWA itself for the purposes of this enforcement action. However, ALCOA asserts two defenses to

the imposition of strict liability for permit violations. First, ALCOA argues that the DMRs are not conclusive evidence of violations of the permit, and that five of the exceedances reported in ALCOA's DMRs were statistically insignificant and should not be considered violations. In addition, AL-COA claims that the government inflated the number of violations by counting an exceedance of the permit's monthly average limitation as separate violations for every day of that month.

### a. DMRs Are Conclusive Evidence Of Violations

■ ALCOA has submitted the affidavit of Jon N. Peace, an industrial hygienist and analytical chemist employed by ALCOA, in support of its position that there is a 95% confidence interval surrounding measurements at or near the permit daily maximum limitations of 40 parts per billion ("ppb") for HCB and 5 ppb for DCBP. Specifically, ALCOA claims that the government cannot prove that five of the excursions reported in ALCOA's DMRs which are below 7.78 ppb actually violate the permit limitation of 5 ppb.

Most courts which have addressed this issue have held that the DMRs filed by a permittee are "virtually unassailable" as admissions that the violations reflected in the reports occurred. *See Natural Resources Defense Counsel, Inc. v. Texaco Refining & Marketing, Inc.,* 800 F.Supp. 1 (D.Del.1992); *Yates Industries,* 757 F.Supp. at 445; *Atlantic States Legal Found. v. Al Tech Speciality,* 635 F.Supp. 284, 289 (N.D.N.Y.1986); *Student Public Interest Research Group of New Jersey v. Georgia–Pacific,* 615 F.Supp. 1419, 1429–30 (D.N.J.1985); *Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 451–52 (D.Md.1985); *Student Public Interest Research Group of New Jersey v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1538 (D.N.J.1984), *aff'd,* 759 F.2d 1131 (3rd Cir.1985). *Cf. Friends of the*

*Earth v. Facet Enterprises, Inc.,* 618 F.Supp. 532, 536 (W.D.N.Y.1984) (rejecting the argument that DMRs alone can be used to impose liability, but acknowledging that alleged measurement errors in the DMRs would not be enough to overcome plaintiff's motion for summary judgment).[13]

In *Sierra Club v. Union Oil Co.,* 813 F.2d at 1492, the Ninth Circuit rejected the defendant's contention that its DMRs were invalid due to sampling errors, and held that exceedances reflected in the DMRs cannot be excused due to mistake.

> The NPDES program fundamentally relies on self-monitoring. The Code of Federal Regulations contains several provisions that are obviously designed to ensure utmost accuracy in the reports submitted by permittees.... These and other EPA regulations demonstrate the agency's concern that reports be accurate. The legislative history surrounding the 1972 amendments to the Act supports the conclusion that accurate reports are critical to effective operation of the Act....
>
> Were we to accept Union Oil's argument ... we would be sanctioning countless additional hours of NPDES litigation and creating new, complicated factual questions for district courts to resolve.... While a permittee's publicly filed reports might clearly indicate that illegal pollution was taking place, the permittee might have additional information ... indicating that a sampling error rendered the reports meaningless. Finally and most importantly, allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for sloppy laboratory practices. Such an approach would surely undermine the efficacy of the self-monitoring program.

*Union Oil Co.,* 813 F.2d at 1491–92.

Contrary to ALCOA's position, the Fifth Circuit has not rejected this line of authority.

---

**13.** The legislative history of the CWA supports these holdings, and emphasizes the importance of simplifying the enforcement process:

> One purpose of ... [the new enforcement requirements] is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under this Act should be based on a relatively narrow fact situations requiring a minimum of discretionary decisionmaking or delay.

S.Rep. No. 414, 92nd Cong., 1st Sess. 64, reprinted in 1972 U.S.Code Cong. & Adm.News 3668, 3730.

Indeed, a careful reading of the case cited by ALCOA in support of its argument that "the Fifth Circuit has held that DMRs are not conclusive evidence of violations," [14] reveals that the case does not actually stand for this proposition. In *Sierra Club v. Shell Oil Co.,* 817 F.2d 1169 (5th Cir.), *cert. denied,* 484 U.S. 985, 108 S.Ct. 501, 98 L.Ed.2d 500 (1987), the court held that the Sierra Club had not met its burden for summary judgment purposes under the citizens' suit provision of the CWA, 33 U.S.C. § 1365(a), which allows citizens to bring a civil action against "any person who is alleged to *be in violation* of ... an effluent standard or limitation." *Id.* at 1174–75.

The evidence submitted by the defendant in *Shell Oil* established that, in many cases, the alleged "violations" were not violations at all, but had been approved by the EPA, or had been based on limitations found to be overly restrictive by the EPA and revised to reflect technological feasibility. *Id.* at 1174. The court found that the remaining violations alleged by the Sierra Club were "occasional, minor discharges ... in the face of permit compliance rates exceeding 95% for the balance of the period in question." *Id.* Thus, the Fifth Circuit determined that the Sierra Club had not shown anything more than isolated, past pollution discharges and had, therefore, failed to establish an ongoing effluent violation by the defendant as required by the citizen suit provision. *Id.* at 1175. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). In fact, the court expressly distinguished the standard to be applied in citizen suits from that which is applied to enforcement actions brought by government authorities:

> Government actions were envisaged to be the central enforcement arm under the Act ... The private enforcement action, on the other hand, is supplementary to the scheme of the statute overall ... [and the provision allowing citizens' suits was designed to] encourage a defendant who is

violating the effluent limitations to "clean up his act" before suit is filed.

*Shell Oil,* 817 F.2d at 1175 (citations omitted).

Thus, *Shell Oil* does not detract from the principle that the statutory scheme calls for strict liability, and "[a] violation is a violation no matter how statistically insignificant." *Connecticut Fund for the Environment v. Upjohn Co.,* 660 F.Supp. 1397, 1416 (D.Conn. 1987) (citing *Connecticut Fund for the Environment v. Stewart–Warner Corp.,* 631 F.Supp. 1286, 1288 (D.Conn.1986)). *See Powell Duffryn Terminals,* 913 F.2d at 77–79; *Union Oil Co.,* 813 F.2d at 1491; *Yates Industries,* 757 F.Supp. at 445; *Student Public Interest Research Group of New Jersey v. Tenneco Polymers, Inc.,* 602 F.Supp. 1394, 1400 (D.N.J.1985); *Student Public Interest Research Group of New Jersey v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1538 (D.N.J.1984), *aff'd,* 759 F.2d 1131 (3rd Cir. 1985).

ALCOA admitted that the data submitted in its DMRs was accurate "within the capabilities of the flow monitoring and analytical methods used...." Under its permit, ALCOA was required to sample and analyze its effluent within the limits of known technology. While the technology utilized may not have been fool proof, ALCOA cannot defeat the government's motion for summary judgment as to the five violations that are allegedly "insignificant," or based on imprecise measurements.

### b. Daily Average Violations [15]

■ ALCOA also claims that the violation of the permit's daily average limitation does not constitute a violation for every day of that month. According to Pamela Teel, an environmental scientist and compliance officer for the Enforcement Branch of the Water Management Division at EPA Region VI, effluent violations of the daily average limitation occurred in August 1987, September 1987, and October 1987. *See* Declaration of Pamela J. Teel (Attachment J, government's

---

14. ALCOA's brief in opposition to plaintiff's motion for partial summary judgment and in support of cross-motion for partial summary judgment, at 10.

15. The term "daily average" is often referred to as a "monthly average." The terms may be used interchangeably. *See United States v. Amoco Oil Co.,* 580 F.Supp. 1042, 1045 (W.D.Mo.1984).

motion for partial summary judgment). Two reporting violations of the daily average limitations for total suspended solids ("TSS") and chemical oxygen demand ("COD") occurred in August 1987. Each of these daily average violations were counted as thirty separate violations, for a total of 150 violations.

The permit defines daily average discharge limitation as "the highest allowable average of 'daily discharges' over a calendar month, calculated as the sum of all 'daily discharges' measured during a calendar month divided by the number of 'daily discharges' measured during that month." Permit TX0056341, at 3, Part II (Attachment E, Exhibit 10, government's motion for partial summary judgment). The permit required ALCOA to monitor each outfall according to the "measurement frequency" set forth in its permit. For example, ALCOA was required to test its discharge for HCB and DCBP twice a week at Outfall 004, and report the average of those measurements as the daily average for the month. Permit TX0056341, at 8, Part I (Attachment E, Exhibit 10, government's motion for partial summary judgment). The permit set a daily average limit for each outfall and each pollutant, and when the average reported by ALCOA in its DMRs exceeded the limit, the government treated it as a violation for every day of the month, and counted thirty separate violations.

The vast majority of courts which have addressed the issue have held that a violation of a daily average constitutes a violation for every day of that month. *See U.S. E.P.A. v. City of Green Forest, Ark.*, 921 F.2d 1394, 1407 (8th Cir.1990); *Atlantic States Legal Foundation, Inc. v. Tysons Foods, Inc.*, 897 F.2d 1128, 1140 (11th Cir.1990); *Atlantic States Legal Foundation, Inc. v. Universal Tool*, 786 F.Supp. 743, 746–47 (N.D.Ind. 1992); *Public Interest Research Group of New Jersey v. Star Enterprise*, 771 F.Supp. 655, 668 (D.N.J.1991); *Chesapeake Bay Foundation v. Gwaltney of Smithfield*, 611 F.Supp. 1542, 1552–53 (E.D.Va.1985), *aff'd*, 791 F.2d 304 (4th Cir.1986), *rev'd and remanded on other grounds*, 484 U.S. 49, 108

S.Ct. 376, 98 L.Ed.2d 306 (1987), *remanded*, 844 F.2d 170 (4th Cir.), *judgment reinstated*, 688 F.Supp. 1078 (E.D.Va.1988), *aff'd in part, rev'd in part and remanded*, 890 F.2d 690 (4th Cir.1989); *United States v. Amoco Oil Co.*, 580 F.Supp. 1042, 1045 (W.D.Mo.1984).

The section of the CWA that authorizes civil penalties provides that any person who violates the CWA or any condition or limitation of a permit "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d).

> While the statute does not address directly the matter of monthly average limitations, it does speak in terms of penalties per *day* of violation, rather than penalties per *violation*. This language strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for the violation should be defined in terms of the number of days in that time period.

*Universal Tool*, 786 F.Supp. at 747 (citing *Gwaltney*, 791 F.2d at 314) (emphasis in original).

This interpretation of § 309(d) most effectively advances the purposes of the CWA.

> [T]he mere fact that a daily maximum is not violated [each day of the month for which a penalty is assessed for violation of the average limitation] does not mean that the polluter's discharges are harmless. Daily maximums for the pollutants at issue are no doubt more lenient than the monthly average because the environment may be able to absorb a relatively high discharge in a single day without incident—while a substantially lower discharge over the course of a month may present an environmental problem.... When a polluter violates a monthly average, every day of its discharges contributes to the violation, even if most of the discharges are within the average that the polluter needs to maintain in order to stay within the monthly limitation.

*Gwaltney*, 611 F.Supp. at 1553.

ALCOA contends that its violations of the average limitation cannot be presumed to be a violation during every day of the month, because the average is computed based on

measurements taken less frequently than every day. The district court in *Gwaltney* rejected a similar argument. 611 F.Supp. at 1553 n. 13. In any event, ALCOA's reasons as to why a particular daily average limitation was exceeded, or justifications which may excuse ALCOA from the imposition of maximum penalties for each day of that month, can be considered in the determination of the actual penalty to be imposed under § 309(d). *Universal Tool,* 786 F.Supp. at 747.

It appears that only one court has found that a violation of the daily average does not constitute a violation for each day of the month. *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.,* No. 83–2040, 1988 WL 156691, at *11 (D.N.J. March 24, 1988). The court determined that evidence of a DMR which reported the daily average exceedance was not sufficient to prove a violation for each day of the month, as the DMR was based on periodic, and not daily, sampling, and held that the DMR could only be used to "establish a single violation on the day of the monitored report." *Id.* at *11. The analysis of the *Monsanto* court is not persuasive. *See Universal Tool,* 786 F.Supp. at 747.

### 2. Monitoring Requirements for Outfall 004

■ Finally, ALCOA states that the monitoring requirements for Outfall 004 never became effective because ALCOA did not "restart" its 42–inch reactor as required by the permit. Permit TX0056341, at 8, Part I (Attachment E, Exhibit 10, government's motion for partial summary judgment).[16] ALCOA claims that the term "restart" was intended by both parties to indicate that the monitoring requirements for Outfall 004 became effective only upon recommencement of the production process. ALCOA did not use the reactor for the production of aluminum chloride from raw materials; instead, ALCOA used it to reprocess contaminated aluminum chloride by means of a revaporization process.

The government asserts that the plain meaning of the term "restart" encompasses the use of the reactor for any purpose, and that the court should not look beyond the permit itself for the construction of its unambiguous terms.

■ The construction of a permit term is "rather like ... [the situation] encountered in connection with questions of interpretation in contract cases." *Amoco Oil Co.,* 580 F.Supp. at 1049. The interpretation of an unambiguous contract is a question of law; a contract is unambiguous when it is reasonably open to just one interpretation, given the surrounding circumstances. *Technical Consultant Services, Inc. v. Lakewood Pipe of Texas, Inc.,* 861 F.2d 1357, 1362 (5th Cir.1988). The determination of whether a contract is ambiguous is also a question of law. *NL Industries, Inc. v. GHR Energy Corp.,* 940 F.2d 957, 967 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). *See* 3 Corbin on Contracts § 554, at 220–225 (1960).

The term "restart" is a broad term which, in light of the circumstances, is reasonably open to more than one interpretation; therefore, it is found to be ambiguous.[17]

■ When the court determines that the contract is ambiguous, it must consider extrinsic evidence of the parties' intent to interpret the contract. *See Carpenters Amended and Restated Health Ben. Fund v. Holleman Const. Co. Inc.,* 751 F.2d 763, 766 (5th Cir.1985). In construing an ambiguous contract, the court must ascertain the intent expressed in the writing by looking not only to the four corners of the agreement, but also to the circumstances surrounding its execution. *Deauville Corp. v. Federated Dept. Stores, Inc.,* 756 F.2d 1183, 1193 (5th Cir. 1985). The history of negotiations between the parties, as well as the events which occurred during the performance of the con-

---

**16.** Seventy-seven of the 174 violations reported are attributable to Outfall 004.

**17.** As ALCOA claims, the term could be limited to the resumption of the production of aluminum from raw materials. As the government argues, it could be given a broader construction, and interpreted to include the use of the reactor for any purpose which could result in the discharge of pollutants.

tract, are relevant in ascertaining the parties' true intent. *See United Thermal Industries, Inc. v. Asbestos Training & Employment, Inc.,* 920 F.2d 1345, 1351 (7th Cir.1990).

 ALCOA argues that, when ambiguity is found, the permit provisions should be construed against the drafter of the permit— the EPA. However, as a general rule, a contract is construed against its drafter only as a last resort—after the application of ordinary rules of construction leave reasonable doubt as to its interpretation. 3 Corbin on Contracts § 559 (1960); *Forest Oil Corp. v. Strata Energy, Inc.,* 929 F.2d 1039, 1043 (5th Cir.1991).[18]

The government's position with regard to the term's meaning is more credible than the interpretation advanced by ALCOA. The permit itself makes no mention of the purpose for which the reactor was to be employed. Further, ALCOA does not dispute that the potential for the emission of chlorinated hydrocarbons was just as great from the revaporization process as it would have been from actual production. Finally, and perhaps most compelling, when ALCOA informed the EPA that it intended to use the reactor for reprocessing off-grade aluminum chloride, the EPA notified ALCOA that the permit's monitoring requirements would be triggered. *See* April 1987 correspondence between O.E. Wilkinson and Kenneth Huffman, Ph.D. (Attachment E, Exhibits 12 and 13, government's motion for partial summary judgment). In fact, ALCOA did conduct monitoring of Outfall 004 after it began to use the reactor, and reported the test results in its DMRs. *See* Declaration of Pamela J. Teel (Attachment J, government's motion for partial summary judgment).[19]

In spite of the convincing evidence submitted by the government, there remains at least some legitimate basis for dispute over the correct meaning of the term "restart" as intended by the parties and used in the permit. As in questions of contract interpretation, the judicial determination of a term's meaning "will often involve the drawing of factual inferences as to which reasonable ... [persons] might differ." *Amoco Oil Co.,* 580 F.Supp. at 1049. Factual disputes with regard to the circumstances surrounding the issuance of the permit and other indicators of the parties' intent when the permit was drafted must be fully considered and resolved. Accordingly, summary judgment with respect to liability for violations at Outfall 004 must be denied.

## IV. CONCLUSION

For the reasons set forth above, the government's motion for partial summary judgment on the issue of liability will be granted in part and denied in part. ALCOA's cross-motion for partial summary judgment will be denied. Finally, ALCOA will be sanctioned for its failure to comply with the docket control order issued by this court. An order incorporating these terms will issue concurrently with this opinion.

---

**18.** The general rule of *contra proferendum* may not be applicable to the interpretation of NPDES permits, which are, in effect, licenses to pollute. Public policy more likely favors strict enforcement of such permits against the permittee. *See United States v. Huebner,* 752 F.2d 1235, 1240–41 (7th Cir.), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 50 (1985) (exemptions from CWA permit requirements must be given a narrow construction against the polluter, to effectuate the Act's purpose of controlling discharges); *United States v. City of Hoboken,* 675 F.Supp. 189, 195–96 (D.N.J.1987) (EPA's interpretation of a permit should govern the determination of a permit's meaning). *See also Sierra Club v. Union*

*Oil Co.,* 813 F.2d at 1491–92 (to allow permittees to submit extrinsic evidence that their publicly filed reports were inaccurate would undermine the efficacy of the CWA's self-monitoring program, and defeat the public's ability to assist in the enforcement of discharge limitations). Whether ambiguous NPDES permits should be construed against the drafter, the EPA, need not be resolved at this time.

**19.** It does not appear that ALCOA contested the EPA's interpretation of the permit conditions at that time.